HENRY (HOVEY v.). See Case No. 6,742.

HENRY (MULLER v.). See Case No. 9,916.

HENRY v. The PARKERSBURGH. See Case No. 10,753.

=====

## Case No. 6,384.

HENRY v. PROVIDENCE TOOL CO.

[3 Ban. & A. 501;[1] 14 O. G. 855.]

Circuit Court, D. Rhode Island. Oct. 9, 1878.

FOREIGN PATENT—DOMESTIC PATENT—WHEN LATTER EXPIRES—"PUBLIC USE."

1. The 25th section of the patent act of 1870 [16 Stat. 201] construed to mean that a patent granted in the United States will expire at the same time as the original term of a foreign patent for the same invention; or, if there be more than one, at the same time as the one having the shortest term, without regard to any prolongation of such foreign patent which the patentee might procure from the foreign government.

[Applied in Reissner v. Sharp, Case No. 11,689. Cited in Bate Refrigerating Co. v.

<hr>

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

Gillett, 13 Fed. 557; Holmes Elec. Prot. Co. v. Metropolitan Burglar Alarm Co., 21 Fed. 459; Canan v. Pound Manuf'g Co., 23 Fed. 187; Paillard v. Bruno, 29 Fed. 865; Bate Refrigerating Co. v. Hammond Co., 129 U. S. 167, 9 Sup. Ct. 228.]

2. Under the act of 1870, a party who has taken out a patent in a foreign country may, at any time during the life of the foreign patent, apply for and receive a patent in this country, provided the invention shall not have been introduced into public use in this country for more than two years prior to the application. The authorities upon the question of what constitutes public use, examined.

[Cited in Perkins v. Nashua Card & Glazed Paper Co., 2 Fed. 453; Driven-Well Cases, 16 Fed. 411; Huber v. Myer's Sanitary Depot, 33 Fed. 49; Andrews v. Hovey, 124 U. S. 712, 8 Sup. Ct. 682: Huber v. N. O. Nelson Manuf'g Co., 38 Fed. 831; Pohl v. Anchor Brewing Co., 39 Fed. 784.]

3. Letters patent No. 119,846, granted to Alexander Henry, October 10th, 1871, for improvements in firearms, held void.

[This was a bill in equity by Alexander Henry against the Providence Tool Company, for the alleged infringement of letters patent No. 119,846, granted to plaintiff October 10, 1871.]

Chauncey Smith and Charles S. Bradley, for complainant.

Benjamin F. Thurston and J. C. B. Woods, for defendants.

CLIFFORD, Circuit Justice. Vigilance is necessary to entitle an individual to the privileges which the act of congress grants to an inventor. It is not enough that he should show his right by invention, but he must in due time secure it in the mode required by law. Shaw v. Cooper, 7 Pet. [32 U. S.] 319. Meritorious inventors cannot be debarred from receiving a patent for their inventions, by reason of the same having been first patented in a foreign country; nor can the patent be held invalid on that account; or be held void because the invention had been known or used in a foreign country before it was made here, if it had not been patented or described in some printed publication. Provision is also made that an invention first patented in a foreign country may be subsequently patented here, if the invention shall not have been introduced into public use here for more than two years prior to the application; but the express enactment is that the domestic patent shall expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term. 16 Stat. 201, 208, §§ 25–62. Such was the language of the act under which the patent in controversy was issued, and the present act also provides, in the same words, that the domestic patent shall be so limited as to expire at the same time with the foreign patent; or, if there be more than one. at the same time with the one having the shortest term. Rev. St. § 4887.

Improvements in rifled fire-arms constitute the subject-matter of the patent described in the bill of complaint; and the patentee states that the invention relates to the arrangement and construction of such fire-arms, and that the essential peculiarity of the improvement consists in the form of the rifled bore, which, as he states, includes a series of planes, angles and grooves, adding that these surfaces may be formed or arranged in various ways; that, instead of relying wholly upon acute angles, semicircular or curvilinear projections or indentations, they may be produced upon the interior of the bore, and he gives examples illustrating some of the modes of construction. In one example of the improved bore, consisting of such a combination of planes and narrow curvilinear or angular surfaces or portions, he states that the surface of the bore, as made up of wide planes and narrow grooves, admits of a plug or missile of larger size than usual, and, of course, requires less expansion to fill the planes than one which touches the centres of the planes only; and he adds, in this connection, what it is important to notice, that while it requires less expansion to fill the planes, there is less windage, and that the planes with the grooves have more power to insure the proper rotation of the missile or ball. Besides that, he also gives another example of the invention in which the planes and internal projections, either round, square or acute, are combined, so as to afford double the number of points of bearing for the missile when in the barrel, and less windage before starting it, and requiring less expansion of the same to fill up the planes, while there is an equal amount or more power to cause the missile to rotate.

[Drawings of patent No. 119,846, granted October 10, 1871, to Alexander Henry, published from the records of the United States patent office.]

Fig. 1.

Fig. 2.

Transverse sections of portions of the barrel of the fire-arm are given in the drawings, showing several modifications of the invention. In the modification shown in figure 1, the barrel is rifled so that in its end view or transverse section it presents a quadrilateral figure with angular projections or bands extending inward from the angles of the planes, or, in other words, the rifling of the barrel forms four plane surfaces, and the periphery of the projectile, which is indicated by a dotted circle, touches the planes at the centres; and, in addition to the bearing-surfaces thus obtained, there are angular projections which extend inward from the planes, so that the apex of each of the projections is concentric with the centre of the surfaces of its contiguous planes. These four ridges thus afford a further bearing or support to the projectile, and by these means double the number of points of bearing are obtained. These angular ridges also fill up to a great extent the spaces between the angles of the planes and the periphery of the projectile, thus reducing the windage by lessening the amount of the expansion necessary to cause the projectile to fit the grooves of the barrel, so that the rotary or spiral motion of the projectile is obtained with greater certainty, and consequently its flight is rendered more accurate. Equally minute and satisfactory explanations of the other figures of the drawings are also given in the specification, which are omitted in the opinion for the sake of brevity. Appended to the specification is a single claim as follows: "What I claim is the system of rifling or grooving fire-arms in which a series of planes or flat surfaces are combined with angular, curved, or rectangular ridges or bands, either intervening between the planes or intersecting the same, as hereinbefore described and shown in the drawings."

These explanations are sufficient to show the nature of the invention which it is alleged the respondents have infringed. Service was made, and the corporation respondents appeared and filed an answer, setting up, among others, the following defences:

1. That the patentee is not the original and first inventor of the improvement.

2. That the patent is invalid, because it is not alleged therein that the invention had not been in public use or on sale in this country for more than two years prior to the application, the supposed invention having been first patented in a foreign country.

3. That the patent in suit, granted on the 10th of October, 1871, expired by operation of law on the 15th of November, 1874, when the foreign patent first obtained by the patentee expired by limitation of law.

4. That the alleged invention, or a substantial and material part thereof claimed as new, was, before the invention of the patentee, described in each of the several patents set forth in the answer.

5. That the alleged invention, or a substantial and material part thereof claimed as new, was, before the invention of the patentee, known to and used by the persons named in the answer and amended answer, and whose residences and the places where such prior knowledge and use were had are also specified and alleged in the answer and amended answer.

6. That the patentee first obtained a patent for the supposed invention in a foreign country, and that the invention had been introduced into public use in this country for more than two years prior to his application for the patent described in the bill of complaint.

Defences not urged at the argument will be omitted in this investigation.

7. They deny that they have made, used or vended the supposed invention of the complainant, or that they have rifled fire-arms, or that they have sold such as were rifled upon the system described in his patent, or that they have in any manner infringed upon his exclusive rights secured in the said patent.

Two of the defences, to wit, the third and sixth, will be first considered, for the reason that they were more discussed at the hearing than the others, and for the further reason that if one or both are sustained it will save the necessity of examining the others.

First. Of these, the first is that the patent, though not granted here until the 10th of October, 1871, expired on the 15th of November, 1874, when the foreign patent expired, which was previously granted to the same party for the same invention. Letters patent were granted to the complainant for the same invention by Great Britain, on the 15th of November, 1860, nearly eleven years before the patent granted to him here bears date. Complainant's patent in suit, which was issued here, was granted under the act of the 8th of July, 1870, the twenty-fifth section of which provides that such a patent shall expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term. British patents at that period were granted for the term of fourteen years, and of course the foreign patent granted to the complainant expired at the time alleged in the answer. Grant that, and it follows that the patent here expired at the same time, unless the proposition of the complainant can be sustained that the language of the act of congress, as copied from the twenty-fifth section of the act, includes not only the term of the foreign patent then in force, but also the term of any prolongation which the patentee might procure from the foreign government. 16 Stat. 201. Acts of parliament at different periods have been passed empowering the crown, by order in council, to prolong the term of a patent under certain restrictions, qualifications and conditions. By the act in force at the time in question, section 69 provides to the

effect that if a patentee shall, before the expiration of his patent, petition her majesty, in council, setting forth that he has been unable to obtain a due remuneration for the expenses and labor in perfecting his invention, and that an exclusive right for the period of seven years will not suffice for that purpose, her majesty is authorized to refer the matter to the judicial committee of the privy council, and if the report of the committee is favorable "it shall be lawful for her majesty, if she shall so think fit, to grant an extension thereof for any term not exceeding fourteen years." Agnew, Treatise, c. 8, p. 179. Henry, the patentee, made seasonable application to the crown for the prolongation of his patent, stating, among other things, that recently a contract had been made by an American firm with the Turkish government to supply six hundred thousand arms, to be made with the barrels rifled on his system, and that he would be unable to derive any benefit from the contract in the shape of royalties, unless the term of his patent was extended. Due report was made by the privy council November 11th, 1874, in favor of prolonging the patent for four years, upon certain restrictions and conditions, but the case shows that the report was not read at the board until thirteen days after the foreign patent expired, reckoning from its date. On that date it was read, and her majesty, in council, ordered "that the lord chancellor, upon the receipt thereof, do cause new letters patent, according to the tenor and effect of the order," to be made and sealed, and that a new patent be granted to the petitioner upon the conditions therein specified. New letters patent, it is provided by a later act of parliament, shall be sealed and bear date as of the day after the expiration of the term of the original patent which may first expire. Agnew, Treatise, p. 179. Viewed in the light of these provisions, the complainant contends that, by the true construction of the act of parliament, the prolongation of a patent is the same in effect as the extension of the original term, and that the extension, by relation, begins to operate at the moment when the original term expired, and the court is inclined to adopt that view as the correct exposition of the act of parliament. Saxby v. Hennett, L. R. 8 Exch. 210.

Suppose that is so, still it does not touch the question in this case, the question here being—What is the true construction of the act of congress under which the patent in suit was granted? When granted, the foreign patent was still in full force, and would not expire for the period of three years; nor could any one foreknow whether a petition for prolongation would ever be seasonably presented; or, if presented, whether any prolongation would ever be granted. Congress employs the words "the foreign" patent, evidently referring to the term of the foreign patent, to define the term of the domestic patent. Had congress intended to grant a pat-

ent for an indefinite term, or for an uncertain and undefined duration, they would have employed suitable words to express such an intent. Our patent act requires every patentee, before he shall receive a patent, to file in the patent office a written description of his invention, and of the manner and process of making and using it, in such full, clear and exact terms as to enable any person skilled in the art to make and use the same.

Requirements of the kind are enacted for several important purposes: I. That the government may know what they have granted, and what will become public property when the term of the monopoly expires.

II. That licensed persons, desiring to practise the invention, may know during the term how to make, construct, and use the invention.

III. That other inventors may know what part of the field of invention is unoccupied. Gill v. Wells, 22 Wall. [89 U. S.] 27.

Adopt the theory of the complainant and none of these requirements would be of any avail, as none could foreknow whether the term of the patent was for three or for seven years, or for some intermediate term of duration, the effect of which would be to make the rights of property in this country depend upon the discretion exercised by a foreign sovereign. Support to that view is derived from the words of the section, which refer not only to the foreign patent, but, if there be more than one, to the one having the shortest term, which, in effect, excludes the theory that the provision in any view can be held to include any subsequent prolongation or extension of the monopoly beyond what was then vested in the foreign patentee. If congress had intended otherwise the language would have been different, and words would have been employed to signify that the domestic patent should continue as long as the same invention was protected by the foreign government.

Under the system prevailing here of extending patents for seven years, while the original term was for fourteen years only, the extended term would, in fact, have been a new grant, had not the eighteenth section of the same act provided that the extended patent should have the same effect, in law, as though it had been originally granted for the term of twenty-one years. 5 Stat. 125. Even admit that the prolongation of the term is, under the foreign system, a continuation of the original patent, and that it takes effect from the day the original patent expires, without any lapse whatever, still it is clear that the admission is of no weight in the present case, as the question to be decided here, is: What right does our patent act confer upon a patentee who first patented his invention in a foreign country? Her majesty, as all must admit, had the power to refuse the petition for prolongation altogether, or to grant it, as she did in this case, upon terms and conditions not found in the original patent. Beyond all doubt she may grant the prolongation for the whole period

recommended by the judicial committee, or for a less period of time, and no one in the case before the court could tell what her action in the premises would be until it took place, which was thirteen days after the term of the original patent expired. In fine, the crown in such matters is supreme under the law of England, and is free to grant the royal favor in whole or in part, or to withhold it altogether. Extensions, when they were authorized here, were inchoate rights under the law, and were so far property that such a right could be sold and conveyed by an instrument of sufficient scope to show clearly that the grantor intended to convey the estate absolutely or upon condition. Assignments of the original patent might or might not convey the right to the extension, dependent upon the language of the instrument, and the intent, expressed or implied, of the parties.

Enough appears in these suggestions to show that there is a wide difference between the legal discretion which the commissioner of patents exercised under the act of congress granting extensions, and the prerogative power exercised by the crown in granting what is called prolongations of original patents. Applications of the kind here, if the statutory conditions were fulfilled, the commissioner of patents had no right to refuse; but a patentee in the foreign country petitioning for a prolongation of the term, if he obtains his request at all, obtains it not as a legal right but as a royal favor, which of itself goes far to support the proposition of the respondents, that congress never intended to extend the term of the domestic patent beyond the legal term secured to the foreign patentee when the domestic patent was granted. Great inconvenience would result from the opposite rule, as neither the authorities of the United States, nor inventors, nor the public would ever, in such a case, be able to know what the patentee acquired under a patent granted here, in a case where the invention had previously been patented in a foreign country. Neither the act of a foreign sovereign, nor the act of a foreign legislature, can have the effect to prolong the term of a patent granted here beyond the term which the act of congress prescribes. Nothing short of a special act of congress can breathe new life into such a patent, after the term prescribed by law has expired. Tested by these several considerations, the court is of the opinion that the patent in suit ceased to be operative when the original foreign patent expired. Repugnant propositions are earnestly, and, no doubt, sincerely urged by the eminent counsel for the complainant, and, in view of the circumstances, the court deems it proper to say that there is another view of the case equally decisive against the right of the complainant to maintain the present suit.

Second. That the supposed invention was first patented in a foreign country, and that the same had been introduced into public use in this country for more than two years prior to his application for the patent described in the bill of complaint. Inventions first patented in a foreign country may be patented here, "provided the same shall not have been introduced into public use in the United States for more than two years prior to the application." 16 Stat. 201. Evidence was given by the respondents showing that the invention was known and used in this country to a considerable extent for more than two years prior to the time when the complainant applied for a patent. Proofs to that effect come from several witnesses, of whom John Boyden was first examined. He testified to the effect that he made the acquaintance of the complainant while on a visit to Edinburgh, in Scotland, in the year 1853, and that he subsequently, at various times during several years, purchased of him shot-guns of his manufacture, which were sold by the witness in this country as he found customers; that in the year 1863 the complainant sent to the witness a sporting rifle containing the patented system of rifling the bore, which, as the witness states, he sold to Nathan Washburn during that year. Three more rifles, containing the same improvement, were sent by the complainant during the succeeding year to the witness, two of which were kept until "some two or three years since," the other one having been returned the year following after it was received. Speaking of the rifle first received, which was sold to Washburn, the witness states that it "created something of a sensation," and that it was accompanied by a certificate of its performance. Newspaper descriptions of the same, it appears, had also been sent to the witness, giving accounts of the "performances of the rifles and their capacity." Washburn paid one hundred and seventy-five dollars for the rifle, which sum was transmitted to the complainant. He, the witness, also states that the first rifle was exhibited to a few persons before it was sold, and that the three rifles received the next year were sent to be sold if customers could be found; that two of the number were used and exhibited at target practice, one of which was purchased by the owner of the one first sent, but was subsequently returned on account of a defect, and that the other was used by the witness. Both Washburn and the witness used these two rifles on different occasions in practising and at turkey-shoots, and the witness states that he used his rifle at the Adirondacks, shooting deer. Sufficient appears to show that the complainant desired the witness to act as his agent and make sales of the rifles sent, and the witness states that he paid over to the complainant the money received for the second rifle, and that he made efforts without success to sell the other two; that he sent one to a firm of gun-dealers in New York for sale, but, being a muzzle-loader, it was not easy to sell that kind in competition

with breech-loaders. He also states that three more military rifles were sent to him during those years as samples, with the purpose of obtaining an order for arms to supply a military organization, but that no order was received. Statements of a similar character are found in the deposition of Nathan Washburn, who was also called by the respondents. Among other things, he states that he first saw a rifle having its barrel rifled as described in the patent in 1863, at the office of the preceding witness, and that he became interested in the rifle from the targets exhibited, which it was said were made with it; that he purchased the rifle in 1863, as represented by the witness, to whom it had been sent for sale. Inquiries were then made of the witness as to the manner and extent the rifle had been used by him subsequent to that time. His answers were to the effect following: That he first went out with the rifle and tried it with a target, and that he found the shooting very satisfactory; that he then attended turkey-shoots, which he followed until they "barred him out" from shooting if he used the rifle with the rifle bore in question; that he made use of the first rifle for some two or three years at shooting-matches, and occasionally permitted others to use it; that he purchased a year later a more nicely finished rifle of the same construction, which proved defective, and he exchanged it for another with the preceding witness. Superadded to that, the witness states that he visited Edinburgh in 1865, and that while there he ordered of the complainant a rifle of the kind, without limit as to price; that in the course of six months a magnificently finished rifle came to hand, the cost of which in currency, at the then premium on gold, amounted to one thousand dollars; that he purchased the rifle for exhibition, but that he had tried its shooting capacity and pronounces it a "splendid shooting gun;" that he thinks he had fired the first rifle purchased fifteen hundred times; that Colonel Berdan called at his house several times to see the rifle, and spent most of two days in examining the rifle and its ammunition, and afterward constructed one and exhibited it at Long Island to a large number of persons; that he, the witness, fired the second one two or three times before "the accident" happened, and that he fired the substitute a great many times, but cannot tell how many. Two of the rifles which the witness purchased were exhibited in court for inspection, and the court is of the opinion that they contain the exact system of rifling described in the patent. Two or more witnesses were examined by the respondents to show that the patented system of rifling the bore of rifles was copied by the company which manufactured Sharp's rifle more than two years before the application for a patent here was filed in the patent office.

Suffice it to say, without reproducing the evidence, that it tends strongly to support the views of the respondents. Waiving that, the testimony of the other two witnesses, whose credit is above suspicion, is amply sufficient to show that the invention was very extensively known among our citizens; that it had been sold or offered for sale in repeated instances, and that it had been used in public many times and almost without number. Of these facts there is no doubt, and the only remaining question is as to their effect. Foreigners have never been permitted to take out a patent in this country, when their invention had first been patented abroad, without some restrictions beyond what was attached to our own inventors. No patent under the act of July 4th, 1836, for an invention previously patented in a foreign country was valid unless the patent granted here was applied for within six months after the publication of the foreign patent. 5 Stat. 121. Six months was the limitation in that act, but the subsequent act provided that a delay for that period should not debar the party from securing a patent here, provided the invention shall not have been introduced into public and common use in the United States prior to the application for such a patent. 5 Stat. 354. Nothing is contained in the succeeding act touching the present question, except that the term of a patent is extended from fourteen to seventeen years. 12 Stat. 246. Quite different regulations, and such as are more liberal to the foreign patentee, were enacted in the act under which the patent in controversy was granted. 16 Stat. 201. Delay to apply for a patent here, however long, within the life-time of the foreign patent, will not debar the applicant in this country from receiving a patent, provided the invention shall not have been introduced into public use in the United States for more than two years prior to the application. Examined in the light of that provision, the only remaining question is whether the evidence exhibited by the respondents proves that the invention had been introduced into public use for more than two years prior to the time when the application for the patent in this case was filed.

Even meritorious inventions first patented in a foreign country could not be patented here under the act of July 4th, 1836, unless the application for the patent here was filed within six months after the publication of the foreign patent, and they were exposed to the danger of having their patents defeated under the act of March 3d, 1839, in case it could be shown that the invention had been introduced into public and common use for any time, however short, prior to the filing of the application. Defendants in a suit upon a patent granted here might, under the act of July 4th, 1836, plead the general issue, and give in evidence that the invention had been in public use or on sale, with the

consent and allowance of the patentee, before his application for a patent, and, if they proved the allegation, they were entitled to judgment. 5 Stat. 123. Cases arose under that provision in which it was held that proof of public use with the consent and allowance of the patentee, even for a day, was sufficient to sustain the defence. Pennock v. Dialogue, 2 Pet. [27 U. S.] 13; Shaw v. Cooper, 7 Pet. [32 U. S.] 318; Mellus v. Silsbee [Case No. 9,404]. Hardships grew out of the stringency of that rule, and congress enacted in the act of March 3d, 1839, that no such forfeiture should occur by reason of such purchase, sale or use, except on proof of abandonment, or that such purchase, sale or prior use had been for more than two years prior to such application for a patent. Expounding that provision, Justice Nelson said: "The patentee may forfeit his right to the invention if he constructs it and vends it to others to use, or if he uses it publicly himself in the ordinary way of a public use of a machine at any time prior to the period of two years before he makes his application for a patent." Pitts v. Hall [Id. 11,192]. Other cases of repute decide in the same way, nor is the court aware that there is any conflicting decision. McClurg v. Kingsland, 1 How. [42 U. S.] 207; M'Millan v. Barclay [Case No. 8,902]; Agawam Co. v. Jordan. 7 Wall. [74 U. S.] 607; Fruit Jar Co. v. Wright, 94 U. S. 94. Justice Swayne says, in the latter case, that a single instance of sale or of use by the patentee may, under the circumstances, be fatal to the patent, and that such is the construction of the clause as given by authoritative adjudications. Roemer v. Simon, 95 U. S. 219. Judicial decisions in England also decide that the phrase, public use, employed in patents granted there, means use in public or in a public manner, in opposition to a secret use, and that it does not mean use by the public generally. Carpenter v. Smith, 1 Webster, Pat. Cas. 534; Hind. Pat. pp. 108, 112; Stead v. Williams, 2 Webster, Pat. Cas. 126. By public use, says Curtis, is meant use in public; that is to say, if the inventor himself makes and sells the thing to be used by others, or it is made by one other person only, with his knowledge and without objection, before his application for a patent, a fortiori, if he suffers it to get into general use, it will have been in public use. Curtis, Pat. § 382. Adjudications to that effect might be multiplied almost without number, but those already referred to are quite sufficient to show that by public use is meant use in public, as stated by all the well-considered authorities upon the subject. Coffin v. Ogden, 18 Wall. [85 U. S.] 124; Reed v. Cutter [Case No. 11,645]; Bedford v. Hunt [Id. 1,217]. Apply those rules to the case before the court, and it is clear that the sixth defence is well sustained, and that the respondents are entitled to a decree upon both grounds, which renders it unnecessary to examine the other questions raised by the pleadings.

Decree in favor of the respondent that the bill of complaint be dismissed with costs.