### HENNEBIQUE CONST. CO. v. MYERS et al.

(Circuit Court of Appeals, Third Circuit. August 19, 1909.)

#### No. 46.

1. PATENTS (§ 132*)—TERM—LIMITATION BY TERM OF PRIOR FOREIGN PATENT.

The provisions of Rev. St. § 4887, before its amendment in 1897 (U. S. Comp. St. 1901, p. 3382), that "every patent granted for an invention which has been previously patented in a foreign country shall be so limited as to expire at the same time with the foreign patent," related to matters of substance and not of form merely, applying only where there is a valid foreign patent, and a United States patent for an alleged invention which was covered by a prior certificate of addition to a French patent is not limited to the term of the French patent, where the same was adjudged null and void by the French courts on the ground of anticipation; the effect of such judgment under the law of France being to render the patent, with any certificates of addition thereto, a nullity from the beginning. Buffington, Circuit Judge, dissenting.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 132.*]

2. TREATIES (§ 11*)—STATUTES—EFFECT OF TREATY.

By the convention concluded at Brussels December 14, 1900, by the International Conference for the Protection of Industrial Property, at which

the United States was represented, it was among other things ordained: "Art. 4 bis. Patents applied for in the different contracting states by persons admitted to the benefit of the convention under the terms of articles 2 and 3 shall be independent of the patents obtained for the same invention in the other states, adherents or nonadherents to the Union. This provision shall apply to patents existing at the time of its going into effect. The same rule applies in the case of adhesion of new states to patents already existing on both sides at the time of the adhesion." This convention was ratified by the Senate March 7, 1901, and proclaimed by the President to go into effect September 14, 1902. 32 Stat. 1936. *Held*, that such treaty was self-executing. and the effect of its ratification was a complete doing away with the interdependence of foreign and domestic patents, and of the limitation imposed on the term of domestic patents for inventions previously patented in foreign countries by Rev. St. § 4887, prior to its amendment in 1897 (U. S. Comp. St. 1901 p. 3382). Per Archbald, District Judge, and Gray, Circuit Judge, concurring.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 11; Dec. Dig. § 11.*]

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

Wm. B. Whitney and John G. Johnson, for appellant.

Arthur Steuart and Drury W. Cooper, for appellees.

Before GRAY and BUFFINGTON, Circuit Judges, and ARCHBALD, District Judge.

GRAY, Circuit Judge. The appellant, as complainant below, on September 16, 1907, filed its bill in the United States Circuit Court, for the Eastern District of Pennsylvania, against the defendants, the appellees here, alleging that letters patent of the United States, bearing date the 4th day of October, 1898, and numbered 611,907, had been issued to it for a certain invention, particularly mentioned and described in the specifications attached thereto, which letters patent granted to the complainant the exclusive right to make, use, and vend the same for the term of 17 years from the said 4th day of October, 1898. The bill then charges defendant with infringement of said letters patent, and prays for the usual injunctions, preliminary and final, restraining the said defendants, their agents, servants, etc., from further infringement or violation thereof, and for an accounting.

The defendants, after having filed an answer to the bill, by consent withdrew the same and filed a so-called plea to the jurisdiction of the court, alleging that under the provisions of section 4887 of the Revised Statutes, before its amendment by Act March 3, 1897, c. 391, § 3, 29 Stat. 692 (U. S. Comp. St. 1901, p. 3382), and as applicable thereto, the patent in suit expired August 8, 1907, prior to the filing of the bill of complaint, by reason of the expiration on that date of a French certificate of addition to a French patent, wherein and whereby the invention of the patent in suit had been previously patented by Hennebique in France.

The replication by complainant to the defendants' answer, was allowed to stand as a replication to the plea. The case was heard upon

an agreed statement of facts, which presented two points of law for decision, viz.:

First, whether a certificate of addition to what was in form a regularly issued French patent, but which has been authoritatively and finally adjudged by the French courts to be a nullity and of no effect in law, can limit the term of a later United States patent for the same invention, under section 4887 of the Revised Statutes, before its amendment by the act of March 3, 1897?

Second, whether the said section 4887 has been abrogated by the treaty known as "An Additional Act for the International Protection of Industrial Property" (32 Stat. 1936), in so far as it provided for the limitation by prior foreign patents of the term of a United States patent which was existing at the time the said treaty went into effect?

The court below sustained defendants' plea and directed the dismissal of complainant's bill, without filing an opinion, or otherwise stating the ground of its action.

The agreed statement above referred to brings into the record, by stipulation, all the facts necessary to the determination of the points of law above stated, including the pertinent provisions of the French law and the decisions of the French courts interpreting the same, and applicable to the French patent, and the addition thereto, referred to in the plea, the effect of which plea was to admit also the allegations of the bill of complaint. From the facts thus fully stated, it appears that the patent in suit was issued to Hennebique, October 4, 1898, upon an application filed December 29, 1897, for the full term of 17 years. It also appears that a French patent, No. 223,546, was issued to Hennebique, in 1892, for a term of 15 years from August 8, 1892, and therefore limited to expire on August 8, 1907. The first certificate of addition thereto was issued to said Hennebique in 1893, and a second certificate of addition on April 6, 1898, upon an application therefor filed December 18, 1897. It is also admitted that, by French law, certificates of additions expire with the expiration of the original patent. It also appears that the invention which is the subject of the patent in suit—

"is the same invention which the same inventor, Hennebique, attempted to patent in France, by filing on December 18, 1897, in full compliance with the law of France then in force, the second certificate of addition to his prior French patent, No. 223,546, which said second certificate of addition was issued April 6, 1898, and granted to him such right as could legally result from such patent and certificate."

It is also established, in the stipulated record, that the original French patent and the first certificate of addition have been declared null and void by the French courts. This was first done on March 4, 1903, in an action brought by said Francois Hennebique against certain persons, for the infringement of said French patent, No. 223,-546, by the Civil Tribunal of First Instance for the Department of the Seine; then, on an appeal taken by the said Hennebique from the said judgment of March 4, 1903, by the French Court of Appeals, on December 14, 1906, a duly certified copy of the decree of the latter court being embraced as an exhibit in the stipulated record. And again, on July 20, 1905, in an action brought by certain complainants against

said Hennebique, under the provisions of article 34 of the French law of July 5, 1844, for the annulment of said French patent, No. 223,546, and said first certificate of addition of August 7, 1893, the Civil Tribunal of First Instance for the Department of the Seine rendered a judgment referring the cause to a board of experts, to examine and report as to the validity of the said French patent, in view of certain prior French patents, and on appeal taken by the complainants from the said judgment, and on cross-appeal taken by said Hennebique, the French Court of Appeals, on December 14, 1906, rendered a decree, in which they held that the reference to a board of experts was unnecessary, reversed the judgment of the Tribunal of First Instance, and held and adjudged that said French patent, No. 223,546, was null and void, in view of a certain prior French patent, and that said first certificate of addition, of August 7, 1893, was also null and void, since, being only an accessory, it could not exist independently of the principal patent. A duly certified copy of said decree is embraced as an exhibit in the stipulated record. Appeals to the Court of Cassation, taken by the said Hennebique, from the said decree of December 14, 1906, were dismissed in February, 1908.

It further appears, by the stipulated record, that the effect in law of the above judgments and decrees, adjudging the nullity of said French patent, No. 223,546, was to render said certificate of addition thereto, of December 18, 1897, equally null and void, and that, by the French law, there is always this difference between the nullity and the forfeiture of a patent, that the forfeiture only affects the future of the patent, while the nullity affects it in the past as well, and that a patent which is null is a patent which is found never to have had any existence, one which in law never had any reason for existing, while, a patent which has become forfeited, on the other hand, is a patent which had a legal existence up to the time when the cause of forfeiture became a fact.

It follows, then, from the agreed statement of facts, that the French patent of 1892, as thus authoritively and finally adjudged, is and always a nullity, and the certificate of addition thereto, of December 18, 1897, as well as that of 1893, never existed in legal effect, because it could receive no life from the dead patent, upon which it was ingrafted. The question then recurs, can the delivery of such certificate of addition, which was a patent in form only, but which granted no monopoly whatever, because it was null and of no effect in law, be regarded as such a prior patenting of the invention of the patent in suit, as will limit the term of that patent under the provisions of section 4887 of the Revised Statutes? That section reads as follows:

"Sec. 4887. No person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid, by reason of its having been first patented or caused to be patented in a foreign country, unless the same has been introduced into public use in the United States for more than two years prior to the application. But every patent granted for an invention which has been previously patented in a foreign country, shall be so limited as to expire at the same time with the foreign patent," etc.

The French patent law confers exclusive rights, under the conditions set forth, for the invention or discovery of a new industrial prod-

uct, or of a new means or new application of old means for obtaining an industrial result or product. It also provides that patents demanded in due form shall be delivered, without previous examination, at the applicant's own risk, and without guaranty as to either the reality, novelty, or merit of the invention; and it also declares that patents delivered shall be null and void whenever the discovery, invention, or application is not new. And it also gives to all parties having an interest therein, a right of action in civil tribunals of first instance, for the annulment thereof.

It was on the express ground that the alleged invention or device of the French patent here in question was not new that said patent was declared by the French courts to be null and void, and that the letters patent were a nullity. The exclusive privilege which purported to be conveyed by the French patent, and the certificates of addition thereto, never legally existed in contemplation of the French law. There was no monopoly, substantial or otherwise, that could withstand challenge; none that could successfully be asserted against the use by the public of the invention purporting to be patented. The words "foreign patent" and "patented in a foreign country," in section 4887, must be taken to connote matters of substance, and not of mere form, and the French patent and the addition thereto, though regular in form, conferred no such privilege or monopoly as would bring them within the purview of the section referred to. They conveyed to the patentee no substantial rights, and secured to him no valuable monopoly which he could enforce in the courts. Société Anonyme v. Gen. Elec. Co. (C. C.) 97 Fed. 604.

There is nothing on the face of the letters patent to show that it is limited to expire at the same time with a foreign patent which limits its life. All letters patent are issued to a qualified inventor for the full term of 17 years, pursuant to the provisions of section 23 of the patent act of 1870 (Act July 8, 1870, c. 230, 16 Stat. 201). Further provisions of the act, as embodied in section 4887 of the Revised Statutes, providing in effect that, when the patentee has been granted in a foreign country such a valid and substantial exclusive privilege or patent as we have above described, the life of a United States patent will expire with the expiration of such foreign patent. No such condition is shown to exist in relation to the patent in suit. The second certificate of addition, of December 18, 1897, covering the same invention as the patent in suit, is shown to have been, by the French law, as set forth in the stipulated record and as adjudged and decreed by the French court, prior to the filing of this bill, a nullity, and void ab initio. It is impossible to hold, therefore, that the term of the patent in suit is limited by the said second addition to the French patent, and the plea to that effect is without merit.

The view we have thus taken makes it unnecessary to consider the second point of law raised by the appellant, viz., whether the said section 4887 had been abrogated by the treaty known as "an additional act for the international protection of industrial property." But, if it is called for in order to support our judgment, I may say that I

agree with the views on the subject expressed in the concurring opinion of Judge Archbald.

The decree of the court below, therefore, sustaining the defendant's plea and dismissing the bill of complaint, is hereby reversed.

BUFFINGTON, Circuit Judge (dissenting). I cannot concur in the opinion of the court. On August 8, 1892, a French patent No. 223,546, for concrete construction, was granted to Francois Hennebique for 15 years. Five years later Hennebique made another and distinct invention, but of the same general character as his above original patent. Under the French law this second invention could be patented either independently or as a certificate of addition to the original patent. This latter course Hennebique followed, and on April 6, 1898, was granted a certificate of addition (numbered 2) for this new invention, to expire August 8, 1907. Under the French law:

"The certificate of addition has no existence of its own, and follows, in all its vicissitudes, the fate of the principal patent. If, then, the patent becomes forfeited, the certificate falls with it as a matter of law, even though the subject-matter of the certificate was itself both new and patentable."

On December 29, 1897, Hennebique applied for an American patent on the invention covered by his second certificate of addition above described, and on October 4, 1898, the patent in suit, No. 611,907, for this invention, a "construction of joists, girders, and the like," was granted to him. Now, it will be observed this patent was not for the invention covered by Hennebique's original French patent, No. 223,-546, granted in 1892, but, as stipulated in the record (clause 5), for the same invention involved in his second addition granted in 1898. Hennebique's invention having thus, as stipulated, been previously patented abroad, the application became subject to, and the term of his patent fixed by, Rev. St. § 4887, which as then in force had this proviso:

"But every patent granted for an invention which has been previously granted in a foreign country shall be so limited as to expire at the same time with the foreign patent, or if there be more than one, at the same time with the one having the shortest term, and in no case shall it be in force more than seventeen years."

Now, clearly, this statute contemplated that the term for which a patent granted under it ran should be fixed by years when it was issued. The use of the word "term"—"at the same time with the one having the shortest term"—shows that and manifests an intent to fix, by reference to the existing term of the foreign patent, the term granted of the American one. "Id certum est quod certum reddi potest." And the statute has been uniformly construed as granting a predetermined, and not a post-determinable, term. In Henry v. Providence Tool Co., Fed. Cas. No. 6,384, 3 Ban. & A. 501, Mr. Justice Clifford, sitting at circuit, had occasion to consider this act with reference to the question whether the term of the American patent was conclusively fixed when the patent issued. He there said:

"What is the true construction of the act of Congress under which the patent in suit is granted? * * * Congress employs the words 'the foreign patent,' evidently referring to the term of the foreign patent, to define the term of the domestic patent. Had Congress intended to grant a patent for

an indefinite term, or for an uncertain and undefined duration, they would have employed suitable words to express such an intent."

After stating the purposes of the patent law and that the requirements of the specification were meant to fulfill them, he says:

"Adopt the theory of the complainant, and none of these requirements would be of any avail, as none could foreknow whether the term of the patent was for three and not for seven years, or for some indeterminate term of duration, the effect of which would be to make the rights of property in this country depend upon the discretion exercised by a foreign sovereign. Support to that view is derived from the words of the section, which refer not only to the foreign patent, but, if there be more than one, to the one having the shortest term, which, in effect, excludes the theory that the provision in any view can be held to include any subsequent prolongation or extension of the monopoly beyond what was then vested in the foreign patentee. If Congress has intended otherwise, the language would have been different, and words would have been employed to signify that the domestic patent should continue as long as the same invention was protected by the foreign government."

Mr. Justice Clifford's construction of the statute was cited and followed by Mr. Justice Blatchford (then Circuit Judge) in Reissner v. Sharp, Fed. Cas. No. 11,689, 4 Ban. & A. 366, saying:

"But Mr. Justice Clifford held that Congress never intended to extend the term of the United States patent beyond the legal term secured to the foreign patentee when the United States patent was granted, and that no act of a foreign sovereign, nor any act of a foreign legislature, could have the effect to prolong the term of a patent granted here beyond the term prescribed by the act of Congress. Mr. Justice Clifford refers, with force, to the considerations that, as the statute refers not only to the foreign patent, but, if there be more than one, to the one having the shortest term, it cannot be held to include any subsequent prolongation or extension of the monopoly beyond that vested in the foreign patentee at the time of the granting of the United States patent; that, if Congress had intended otherwise, the language would have been different, and words would have been employed to signify that the domestic patent should continue as long as the same invention was protected by the foreign government; and that, under the opposite rule, neither the authorities of the United States, nor inventors, nor the public would ever be able to know what the patentee acquired under a patent granted by the United States, in a case where the invention had been previously patented in a foreign country."

That Rev. St. § 4887, fixed unchangeably the term of the American patent was the view of Mr. Justice Bradley, who in Bate Refrigerating Co. v. Gillett (C. C.) 31 Fed. 815, says:

"The term of the English patent fixed the term of the American patent, nothing more, nothing less. The subsequent fate of the English patent had no effect upon the American. The life of each after its inception proceeded independently of the life of the other. See Protective Co. v. Burglar Alarm Co. (C. C.) 21 Fed. 458; Paillard v. Bruno (C. C.) 29 Fed. 864."

In the case cited from 21 Fed. 458, Judge Wheeler said:

"The statute merely required that in such case [that is, where there is a prior foreign patent] the patent shall be so limited as to expire at the same time with the foreign patent. Rev. St. § 4887. This seems to mean that the term of the patent shall be as long as the remainder of the term for which the patent was granted there, without reference to incidents occurring after the grant. Henry v. Providence Tool Co., Fed. Cas. No. 6,384, 3 Ban. & A. 501; Reissner v. Sharp, 16 Blatchf. 383, Fed. Cas. No. 11.689. It refers to fixing the term, not to keeping the foreign patent in force."

And in Paillard v. Bruno, supra, Judge Wallace held:

"According to the construction thus placed upon the section, it should be read as though it declared that the United States patent is to expire at the same time with the term of the foreign patent previously obtained for the same invention, or, if there be more than one, at the same time with the one having the shortest term. Upon this construction the duration of the term of the United States. patent fixed when the patent issues, according to the maxim, 'Id certum est quod certum reddi potest.' Under any other construction, neither the Commissioner of Patents, nor the patentee, nor the public would know the duration of the grant. The term of a patent is the period of duration expressed in the grant. It may be terminated by operation of law, or by the act of the parties, at an earlier time; and consequently it might happen that of two patents the one having the shortest term may have the longest life."

So, also, Judge Simonton, in Bonsack v. Smith (C. C.) 70 Fed. 392, held:

"In construing this section, the meaning of the words 'expire' and 'term' is controlling. Section 4887 makes the American patent 'expire' at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest 'term.' The Supreme Court of the United States, in one of the few cases on this point, construe this word 'expire' to mean cease to exist because of the termination of the duration of the original grant, and not to mean cease or determine by reason of some penalty or forfeiture for the nonperformance of some condition subsequent. Pohl v. Brewing Co., 134 U. S. 381, 10 Sup. Ct. 577, 33 L. Ed. 953."

To me it is clear that, as said above, the words "expire" and "term" are the controlling words of the statute, and that the word "expire" means an expiration by lapse of the time of the term. The words "so limited as to expire at the same time with the foreign patent" are equivalent to reading "so limited as to expire at the same time with [the expiration of the term of] the foreign patent"; or, in other words, "expire" refers solely to an ending at the end of the term by the passage of time. And that this is the proper construction of the section is apparent from what was said in Pohl v. Brewing Company, supra. It is true the question there before the court was the alleged lapsing of the domestic patent by the subsequent forfeiture of the limiting foreign one. But in deciding that question it was held that no such lapse took place, because there was nothing in the statute to limit the duration of the domestic patent, save the duration of the legal term of the foreign patent in force at the time. Thus it is said:

"There is nothing in the statute which admits of the view that the duration of the United States patent is to be limited by anything but the duration of the legal term of the foreign patent in force at the time of the issuing of the United States patent, or that it is limited by any lapsing or forfeiture of any portion of the term of such foreign patent, by means of the operation of a condition subsequent, according to the foreign statute. In saying that 'every patent granted for an invention which has been previously patented in a foreign country shall be so limited as to expire at the same time with the foreign patent,' the statute manifestly assumes that the patent previously granted in a foreign country is one granted for a definite term; and its meaning is that the United States patent shall be so limited as to expire at the same time with such term of the foreign patent. * * * In the view that section 4887 is to be read as, if it said that the United States patent is to be so limited as to expire at the same time with the expiration of the term of the foreign patent, or, if there be more than one, at the same time with the expira-

tion of the term of the one having the shortest term, the interpretation we have given to it is in harmony with the interpretation of the words 'expiration of term' in analogous cases. Oakley v. Schoonmaker, 15 Wend. (N. Y.) 226; Beach v. Nixon, 9 N. Y. 35; Farnum v. Platt, 8 Pick. (Mass.) 339, 19 Am. Dec. 330. In those cases it was held that the words 'expiration of term' do not mean expiration of term through a forfeiture by breach of a condition, but mean expiration by lapse of time."

And the case of Oakley v. Schoonmaker, supra, which is thus approved, brings out very clearly that the expiration of the term is an expiration at its time limit, saying:

"The landlord cannot avail himself of the tenant's violation of his agreement as to cutting wood, if that were an act which would work a forfeiture. That is not the expiration of the time referred to in the 1st subdivision of the twenty-eighth section. The statute means expiration by lapse of time."

These cases constrain us to hold that when the American patent was granted to Hennebique, there then being a prior French patent to him which expired on August 8, 1907, the American patent was unchangeably fixed to expire on that day. Such became the contract between him and the government, and thereby the latter contracted to give Hennebique a monopoly of his invention until August 8, 1907. Such were the terms of the grant, and under all the foregoing cases such would have been the construction placed by them on that contract. Now, as the stipulation concedes the identity of the two inventions, Rev. St. § 4887, applies, and it necessarily follows that, if that contract is to be reformed or modified, it must be so because the statute so provides. But the statute nowhere so provides.

It is said, however, in the majority opinion, that when the words "foreign patent" were used in the statute Congress in effect meant a valid foreign patent and one that on legal test should be adjudged valid. The simple answer to such a contention is that the act nowhere so says. By its silence it made no criterion of the void, voidable, or forfeiture character of the foreign patent, and the only feature thereof it does, by reference, adopt is its length of term, and where there is more than one patent it takes the shortest as embodying the contract it makes with the foreign inventor. The intent of the statute is manifest. Finding an outstanding monopoly granted by a foreign government for the same invention, it contracted to grant a domestic monopoly for that term. It simply inquired whether this invention "has been previously granted in a foreign country." Whether the patent was void or voidable, forfeitable or not, was not provided for by the statute. Length of term was the only test, or, as Justice Bradley put it in his direct, forcible words:

"The term of the English (foreign) patent fixes the term of the American patent, nothing more, nothing less."

That is the plain meaning of the words. There is no ground for construction or the interjection of supposed intent. By the use of apt words of reference to the term of the foreign patent as a measure of time, and by its omission to refer to the terminable character of such foreign patent, Congress has made the then existing foreign time term the sole pertinent factor to fix the future time of the domestic

patent. This, I submit, is in view with what was said in Bate v. Sulzberger, 157 U. S. 37, 15 Sup. Ct. 516, 39 L. Ed. 601:

"Congress, in effect, by the existing law, says to an inventor seeking to enjoy the exclusive use in this country of his invention for the full term prescribed by law: 'If your invention has not been introduced into public use in the United States for more than two years, you may, upon complying with the conditions prescribed, obtain an American patent, and you may, if you can, obtain a foreign patent. But the American patent will be granted on the condition that, if you obtain the foreign patent first, your invention shall be free to the American people whenever, by reason of the expiration of the foreign patent, it becomes free to people abroad; but in no case shall the term of the American patent exceed seventeen years.' This we deem to be a sound interpretation of the statute, giving to the words used the meaning required by their ordinary signification. In our judgment the language used is so plain and unambiguous that refusal to recognize its natural, obvious meaning would be justly regarded as indicating a purpose to change the law by judicial action based upon some supposed policy of Congress."

On March 4, 1903, the original patent of Hennebique was, in a suit in the French courts, adjudged to have been anticipated by an earlier patent to Monier, and was therefore null and void, and in appeals to higher courts that decision was finally affirmed in February, 1908. In this litigation the Hennebique second addition was neither mentioned nor made the subject of decree; but under the French law quoted such second addition fell, not because it did not involve invention, but because the original patent on which it was ingrafted had been annulled. The opinion of this court now holds that the effect of this annulment of the French patent in a proceeding begun after the American patent had issued was the same as if no foreign patent existed when Hennebique's American patent was granted, and therefore Rev. St. § 4887 does not apply. The practical effect of this construction is that a statute which was intended (see Mushet's Case, Commissioner of Patents' Decisions, p. 105, approved in Huber v. Nelson, 148 U. S. 275, 13 Sup. Ct. 603, 37 L. Ed. 447) to place the American public on a parity with foreign countries with relation to foreign inventions by releasing the American monopoly as soon as it was released abroad is made to so operate that the release of the monopoly abroad, instead of releasing it here, actually extends it eight years longer than would have been the case had no steps been taken to release it abroad. And that this radical change in his patent was brought about in a suit honestly instituted by Hennebique himself still shows the grave dangers to which the patent system is subject, when the future of an American patent is not a matter of contract right, but one dependent upon the action of one of the parties to it. A result so at variance with the reason and spirit of the law is not to be imputed to Congress. It tends to unsettle rights, for when this patent was issued the public had a right to assume that 1907 was the limit of Hennebique's American patent. His French patent was then in force. The French law provided with reference to such patent:

"This right is established by deeds delivered by the government under the name of patents of invention."

No step has been taken to annul it. It was on this status in France that Hennebique's American patent was granted in 1898, to expire in

1907. That the annulment of that French patent, begun three years later, should in any way affect the American patent, much less that it should extend its monopoly eight years, is a proposition whose statement seems to me its answer.

ARCHBALD, District Judge (concurring). I concur in the view that the act of Congress, in limiting a patent in this country by the term of one previously granted for the same invention abroad (Rev. St. § 4887), presupposes that the foreign patent is valid, and, where this proves not to be the case, that the patent here continues for the full term of 17 years which it would otherwise enjoy. I do not agree that the term of the patent abroad is written into and becomes the term of the patent here, regardless of whether such foreign patent is inherently good or bad. The purpose of the law is manifestly to limit the monopoly secured by the patenting of the invention, so that it shall come to an end, and the invention be free for the benefit of citizens of this country, when it becomes free in the country where it was first patented and protected. But where there never was a valid patent there, and except in name the invention was not thus in fact protected, the reason for the law disappears, and with it the application. Société Anonyme v. General Electric Company (C. C.) 97 Fed. 604. The case is not to be identified or confused with that of a foreign patent, which, after having been granted for a definite term, lapses or becomes forfeited by force of a condition subsequent, as for nonworking, or the failure to pay a renewal fee. Pohl v. Anchor Brewing Company, 134 U. S. 381, 10 Sup. Ct. 577, 33 L. Ed. 953; Leeds & Catlin v. Victor Talking Machine, 213 U. S. 301, 29 Sup. Ct. 495, 53 L. Ed. 805. The foreign patent, in a case of that kind, having issued for a definite term, and the domestic patent being limited by it, the term so fixed at the beginning is held to continue, without regard to what may so subsequently happen; the life of each, after its inception, proceeding independently of the other. Bate Refrigerating Company v. Gillett (C. C.) 31 Fed. 809. But the lapse or forfeiture of a foreign patent short of the term for which it was originally granted is quite different from its being judicially determined never to have had any validity or life at all. And the effect of getting rid of it in this way, by which a domestic patent for the same invention is left free to enjoy to the full the term to which under our laws it would normally be entitled, is not to be likened to the cutting down or shortening of the term of the patent abroad, by what has incidentally come about with regard to it afterwards. The one is an attempt to reduce or abridge the original grant. The other merely clears the way for the assertion of that which, rightly considered, the patent is to be regarded as having possessed from the beginning. It is true that it is all one if, good or bad, and for all purposes, the term of the foreign patent is the term of the domestic one. But that is not the logic of the situation. It cannot be that Congress intended to limit the patent here by a patent abroad that was absolutely good for nothing. As declared by this court in Atlas Glass Company v. Simonds Manufacturing Company, 102 Fed. 647, 42 C. C. A. 558, the words "previously patented in a foreign country," as found in the section of the Revised Statutes referred to, must be taken to mean "patented

according to the laws and usages of such foreign country, provided a substantial monopoly is thereby granted." And this cannot be affirmed where for any reason such patent, as here, is inherently invalid.

In view, however, of the differences between the members of the court over this question, the effect of the treaty of Brussels, in my judgment, requires attention. The decree below certainly cannot be affirmed without first considering it. By the convention concluded at Brussels December 14, 1900, by the International Conference for the Protection of Industrial Property, at which the United States was represented, it was, among other things, ordained:

"Art. 4 bis. Patents applied for in the different contracting states by persons admitted to the benefit of the convention under the terms of articles 2 and 3 shall be independent of the patents obtained for the same invention in the other states, adherents or nonadherents to the union. This provision shall apply to patents existing at the time of its going into effect. The same rule applies in the case of adhesion of new states to patents already existing on both sides at the time of the adhesion."

This convention was additional to that similarly conclud·l at Paris March 20, 1883, to which the United States was not originally a party, but subsequently gave its adherence, and was ratified by the Senate March 7, 1901, and proclaimed by the President, August 25, 1902, to go into effect September 14 following. 32 Stat. 1936. Taken as it reads, it provides for the absolute independence of previously interdependent domestic and foreign patents; and if self-executing, and not otherwise controlled, it relieves the patent in suit from the effect of the French patent to which reference has been made, whether valid or invalid.

It appears, however, that, at the first session of the same conference, in December, 1897, after the article in question had been formulated, Mr. Forbes, one of the delegates on the part of the United States, pointed out that, as it stood, it would apparently apply to patents existing at the time it was put in force, and that this would be contrary to [the spirit of] our laws, which do not permit of a retroactive effect being given them. He explained that the law in the United States with regard to the interdependence of domestic and foreign patents had been modified (evidently referring to Act March 3, 1897, amending Rev. St. § 4887 [U. S. Comp. St. 1901, p. 3382]), whereby the provision had been eliminated that the term of a patent here for an invention previously patented abroad should be limited to expire at the same time with it, but that this interdependence was retained as to patents delivered prior to January 1, 1898, their terms being fixed at the time of their issue, and that if article 4 bis was interpreted as extending to patents already issued, as it possibly might be, it would run counter to the principle of nonretroactivity with which our laws are inspired. To avoid the objection which might be raised by the United States upon this score, he inquired whether article 4 bis could not be made the subject of a special protocol. After a discussion of the subject by several delegates, in the course of which it was suggested by Mr. Morel, director of the International Bureau, that the article, while made to apply to existing patents, should be expressly limited in its effects to nullities and lapses subsequently occurring, it was propos-

ed by Mr. Bellamy Storer, another of our representatives, that a proviso should be added: "However, the term fixed by the internal law of each country remains intact;" it being explained by him that this would only apply to patents in existence at the time the article went into force, the effect of which would be that patents delivered in the United States up to December 31, 1897 (the date to which the interdependence of foreign and domestic patents was preserved by the act of March 3, 1897), would be limited by the normal term of patents previously issued for the same invention, the same as they were by the existing law. It was not deemed advisable by the conference, however, to make any changes in the text of the article, either that submitted by Mr. Storer or that suggested by Mr. Morel, but that it should receive, instead, the interpretation which the American delegation desired, and, with this understanding entered on the minutes, the article was finally adopted. That there may be no question as to this being a correct summary of the proceedings, they are produced in full in the margin.[1]

If this were all, it might perhaps be a question whether the construction so impressed on the article by common consent at the time of its adoption would not have to be respected, in accordance with which it would be restricted, so as not to interfere with or disturb the terms of patents issued or applied for in the United States up to December 31, 1897, which would be left as they stood by the existing law. And, in conformity with this, the patent in suit, having been applied

---

[1] December 13, 1897.

The new article relative to the reciprocal independence of patents is unanimously agreed to. This article which bears No. 4 bis, is expressed in the following terms:

"Art. 4 bis: Patents applied for in the various contracting states by persons admitted to the benefits of the convention under the terms of articles 2 and 3 shall be independent of patents obtained for the same invention in the other states, whether adhering to the union or not.

"This provision shall apply to patents in existence at the time of its being put in force.

"The same thing shall apply in the event of the accession of new states, to patents existing on either side at the time of accession."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

December, 14, 1897.

In regard to article 4 bis relating to the reciprocal independence of patents, Mr. Francis Forbes, delegate from the United States, makes the following remarks:

"According to the second paragraph the new order would apply 'to patents existing at the time of its being put into force.' Now, in the United States the law cannot have a retroactive effect. The stipulation in question would therefore receive objections on the part of the American government, objections of such a nature as to retard the signing of the additional act."

Desiring to avoid this eventuality, Mr. Forbes inquires if article 4 bis could not be made the subject of a special protocol. The president consulted the conference on this question, in order to learn if it was agreeable to the conference to modify the text submitted for the signature of the delegates, or whether it would be sufficient to mention in the minutes the reservation made by the delegate from the United States.

Mr. Francis Forbes would readily accept the arrangement if it be clearly understood that it should not have a retroactive effect in his country. He explains that the law of the United States has been modified in relation to reciprocal independence. Patents delivered prior to January 1, 1898, however,

for two days before the change, introduced by the act of March 3, 1897, went into force, would be excepted out of the effect of the article, being limited by the French patent previously granted which is now brought forward, provided, of course, that that is the effect of it, valid or invalid.

It is to be noted, however, that, although a report of the work of the conference was made by our delegates, it was not ratified. But a second session having been held in December, 1900, and the subject having again come up, article 4 bis was adopted, with others, in the exact form in which it had before been agreed to; and the treaty, of which it was a part, having been submitted to our government, was ratified by the Senate and proclaimed by the President, as already stated. The question now is whether it is to be taken as it reads, or

remain dependent, so far as their term is concerned, upon the corresponding foreign patent taken out for the same invention; their term being fixed at the time of their deliverance. Now, it might happen that article 4 bis would be interpreted as meaning that all patents issued before the coming into force of the new law should extend during their entire term of 17 years, while from the moment of their issuance these patents ought to be considered as limited in duration by the patents delivered at an anterior date. This interpretation could only be admitted in the United States by means of a special law, which would be contrary to the principle of nonretroactivity with which all American legislation is inspired.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Mr. Dubois, delegate from Belgium, is of the opinion that article 4 bis is designed only to produce effects after the patent has been issued, and consequently it is not contrary to the American law. It is really not the purpose to retroactively modify the normal term of the patent, which remains such as it was fixed by the law in force at the time of its issuance.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Mr. Francis Forbes insists on the necessity of stating this point very precisely, in order to avoid errors of interpretation, which would have very regrettable consequences, in case of the acceptance of the additional act by the United States.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Mr. Morel, director of the International Bureau, calls attention to the object aimed at by the conference in voting article 4 bis. He believes that satisfaction might be given to Mr. Forbes by introducing a condition in the second paragraph of this article, excepting very explicitly incidents which are anterior to its being put into force. He suggests for this paragraph the following amendment:

"This provision shall apply to patents in existence at the time of its being put into force. Its effects are, however, limited to nullities and lapses which would affect anterior patents."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Mr. Michel Pelletier, delegate from France, remarks that, the reciprocal principle of independence being admitted, it is not advisable to restrict same by new provisions.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Mr. Dubois gives his opinion as to the situation which will result from the article 4 bis. This establishes the principle of independence as to incidents, notably lapses and nullities, which may occur after the issuance of the patents; but the internal law can freely fix the normal duration of the patent taken out in the country.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Mr. Michel Pelletier also expresses the opinion that the independence has the precise effect of suppressing all relations between the various patents,

whether it is to be qualified by the understanding at the time it was adopted at the first session of the conference.

There is no better example of the uncertainty introduced, when parol evidence is resorted to, to control the effect of a written instrument, than is afforded in the present instance. By the plain terms of the article foreign and domestic patents are rendered independent, and this provision is expressly made to apply to existing patents without any apparent restriction or qualification; complete independence being substituted for the previous interdependence by which up to that time they had been hampered. The objection raised to this by the delegates from the United States, as we have seen, was that it might be held to operate retroactively, and in that way enlarge the term of existing patents, which would otherwise be restricted by the limitations

and leaves to each national law the care of regulating all matters pertaining to patents taken out in the country.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

His Excellency, Mr. Bellamy Storer, delegate from the United States, asks if the following words could not be added:

"However, the term fixed by the internal law of each country remains intact."

This addition would, of course, only apply to such patents as exist at the time of the coming into force of the additional act. Its bearing in the United States would be: The patents delivered under the rules of the existing law—that is, until December 31, 1897—would be limited by the normal duration of foreign patents of an anterior date, issued to the same inventor for the same invention. Their duration would then remain as it was at the moment of the coming into effect of the existing law.

The president proposes to leave the text of article 4 bis without any change, and to state in the minutes of the meeting that this article should receive the interpretation which has just been indicated. The American delegation would thus obtain complete satisfaction.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

His Excellency, Mr. Bellamy Storer, declares this combination acceptable, if it meets with the unanimous adhesion of the conference.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

Count Hamilton, delegate from Sweden, pronounces himself in favor of an addition to article 4 bis in the sense as indicated by Mr. Morel.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

The Very Honorable C. B. Stuart Wortley, delegate from Great Britain, remarks that it is important, in the examination of the question, to take into consideration article 2 of the general convention, which guarantees to those under the jurisdiction of the contracting states, the benefit granted in each country to natives thereof. The subjects of Great Britain have then for their patents in the United States a right of protection for a period of 17 years according to the American law.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

Mr. De Ro, delegate from Belgium, supports the proposition of the president, to record in the minutes the harmony existing in the convention as to the effect of article 4 bis, to which proposition His Excellency, Mr. Storer, has kindly acceded.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

The president puts to a vote the adoption of the text previously adopted for article 4 bis, with the interpretation which the American delegation desire to specifically point out by proposing to complete the second paragraph by supplementing this explanatory clause:

"However, the term fixed by the internal law of each country remains intact."

Article 4 bis is definitely adopted with these conditions.

imposed by the law as it stood at the time they were granted. In the course of the discussion which followed it was suggested by other delegates that this could be met and disposed of by confining the effect of the provision to nullities and lapses, establishing the principle, as it was said, of independence as to incidents occurring afterwards. But this did not meet with favor. And it was finally agreed that the article should be adopted as it had been formulated, with the interpretation desired by the United States delegates, entered on the minutes, to qualify it, that "the term fixed by the internal law of each country remains intact"—meaning, in the light of the context, that the article was not to be retroactive, but that existing patents were to continue to have the limited term imposed upon them at the time they were granted by the term of a foreign patent previously obtained for the same invention. And yet we have the delegates from this country, when they came to make their report, stating that:

"It was the unanimous sense of the conference that the paragraph was not applicable to existing United States patents, but only to those patents whose terms might be shortened by the laws of those states of the union in which provision is made for a shortening of the term on the lapsing of patents for the same inventions in other states."

Or, as it is further explained, that the duration of a patent here, being determined by the state of the law at the time it was granted, "is unaffected by the subsequent expiration of a foreign patent for the same invention by reason of nonpayment of taxes or nonworking." But this is exactly what the conference did not agree to, if I understand the proceedings. Indeed, if the only independence proposed by the article was as to lapses and forfeitures of previous patents for the same invention in other countries, the objection made by our delegates, as well as the resulting discussion and the amendments proposed to overcome it, were without point and meaningless; it being well settled, as must have been known to them, that, under section 4887, patents in the United States are only limited by the normal term of foreign patents, and that the lapsing or falling in of the latter for nonpayment of renewal fees or similar incidents have no effect on the term of a subsequent patent for the same invention here. Pohl v. Anchor Brewing Company, 134 U. S. 381, 10 Sup. Ct. 577, 33 L. Ed. 953. Bate Refrigerating Company v. Sulzberger, 157 U. S. 1, 15 Sup. Ct. 508, 39 L. Ed. 601.

Assuming, then, that we were at liberty to go outside of the article as it stands, which interpretation of it is to be taken—that reported by our delegates (which is the only one, by the way, that was likely to have been brought to the Senate, so as to influence it in ratifying, if that is of any consequence), as to the incorrectness of which there can be no question, or that derived from the minutes of the proceedings, as they appear in the journal of the conference, which alone can be regarded as having been carried forward into the result of the succeeding session, which is insisted on? It may be that either view favors the defendant. But that is not the question. The article must not be open by parol to a double construction, and that one must be adopted which will apply to all cases, not only in this country, but elsewhere. While the action of the conference was taken at the instance of the

delegates from the United States to answer the objection that, contrary to the spirit of our laws, the article might be held to be retroactive, the explanation accompanying its adoption was not limited to patents here, but was of general application affecting all the states represented at the conference who might ratify it; and this dilemma might arise in consequence: That other states, relying on the minutes of the proceedings, would interpret the article one way, while the United States, under the lead of our delegates, would take it another, resulting in serious confusion and conflict. And that this is by no means an impossible situation, we find it declared by the French government, as the reason for ratifying it, that all the inconveniences, arising from the reciprocal dependence of patents taken out in different countries, are made to disappear by the article in question, the effect of it being to suppress all connection between such patents, leaving to the law of each state the regulation of the terms of patents taken out in that country; a view, quite aside, as it will be noted, from that suggested in the report of our delegation. And the Italian Ministry of Agriculture, Industry, and Commerce, in May, 1903, being called on to make a deliverance upon the subject, while conceding that it was for the judiciary to determine the subject finally, as a matter of executive guidance in case of the demand for the patenting of an imported invention patented abroad, or of a claim of priority based on the filing there of an earlier application, also recognized that article 4 bis was in derogation of the existing statute law of Italy, which, the same as in the United States, limited the term of a domestic patent by the term of a patent for the same invention taken out before that in a foreign country; and that patents, thereafter applied for, should therefore be allowed the full term of 15 years, provided by law, notwithstanding that the invention had been made public by the previous granting of a foreign patent for it, although applications for a patent of importation, resting on other principles and not being provided for by the conference, were in a different position.

But we are relieved from the necessity of going into this subject further. As already stated, there was no ratification of the action of the 1897 conference, and it cannot be successfully maintained that, without any mention of, or reference to, it, what occurred at it was carried forward into the session of 1900 and written into article 4 bis as there adopted without qualification or objection. Upon being ratified by the states participating in the conference, in the form in which it was so cast, it became the treaty law between them, mutually governing their citizens and subjects, to be interpreted according to the terms in which it was couched, unaffected by any reservation or explanatory restriction not expressed in it. A treaty is a contract, and is to be so construed as to carry out the apparent intention of the parties as disclosed by its terms. Geofroy v. Riggs, 133 U. S. 258, 10 Sup. Ct. 295, 33 L. Ed. 642. Where the words convey a definite meaning, and there is no contradiction between the different parts of it, the meaning deduced from the face of the instrument is the one to be taken, and courts are not at liberty to add to or detract from it. Or, in other words, the meaning is to be ascertained by the same rules of construction and course of reasoning as are applied to the interpretation of

private contracts. 28 Am. & Eng. Ency. Law (2d Ed.) 488; Tucker v. Alexándroff, 183 U. S. 424, 437, 22 Sup. Ct. 195, 46 L. Ed. 264. With due deference, therefore, to the apparent position to the contrary taken at the first session of the Brussels Conference, it is not to be thought of that a treaty ratified and confirmed by the participating powers in a definite and unambiguous form can be limited or qualified by a resolution passed at a preliminary conference, which is not by reference or otherwise incorporated into or made a part of its terms, so as to be submitted to the different countries called upon to consider and ratify it. Where qualifications are found necessary, after a treaty has been formulated, if the text is not changed, they are brought in by way of explanatory protocols at the end, as is shown by the treaty of 1883 in question, where a number of them will be found. And this may have been what Mr. Forbes had in mind, when he proposed a special protocol against article 4 bis being given a retroactive effect. And, had this course been pursued, it would have removed all difficulty. But unfortunately it was not. And a mere resolution on the minutes of the conference cannot be held to take its place.

There is nothing in Doe v. Braden, 16 How. 635, 14 L. Ed. 1090, which is counter to this. In that case the treaty with Spain, by which Florida was ceded to the United States, was under consideration; and it appeared that, subsequent to its negotiation and after the terms had been agreed on, the Secretary of State requested and received an admission from the Spanish Minister that certain grants of land by Spain in Florida should be annulled, and this was annexed to the treaty at the time of its ratification and promulgated with it, and it was held that it was as obligatory as if inserted in the treaty itself. "It is too plain for argument," as it is said, "that when one of the parties to a treaty, at the time of its ratification, annexes a written declaration, explaining ambiguous language in the instrument, or adding a new and distinct stipulation, and a treaty is afterwards ratified by the other party with the declaration attached to it, and the ratifications duly exchanged, the declaration thus annexed is a part of the treaty, and as binding and obligatory as if inserted in the body of the instrument." But there is nothing of that kind here. So in Kinkead v. United States, 150 U. S. 483, 14 Sup. Ct. 172, 37 L. Ed. 1152, the correspondence between the Secretary of State and the Russian Minister, with respect to the terms of the sixth article of the treaty by which Alaska was taken over was accepted as explaining the meaning of certain expressions in that article, but not, however, to control the scope of it. The case of New York Indians v. United States, 170 U. S. 1, 18 Sup. Ct. 531, 42 L. Ed. 927, is much more in point; it being there held that a qualifying provision, passed by the Senate at the time of the confirming of a treaty with certain Indian tribes, compliance with which was made an express condition of the treaty going into force, was of no effect to modify it, as it was promulgated by the President, in which no allusion to the provision was made.

Without further discussion, therefore, it is clear that article 4 bis, having been duly ratified by the different states represented in the conference in the form in which it now appears, must be taken as it reads, according to which the dependence of domestic on foreign patents for

the same invention, previously granted abroad, is entirely removed and done away with. And this is to be interpreted liberally. As resolved by the Convention of Turin, in September, 1902, a few days after the treaty went into effect in the United States:

"The independence of patents proclaimed by the additional act of Brussels ought to be construed in the broadest terms, and particularly in such manner that the term of a patent shall not in any case be dependent upon the term of another patent."

Nor is this to be confined, as conceived by our delegates, to such subsequent incidents as nullities and lapses by reason of the nonpayment of renewal fees or nonworking; an attempt to so limit it having been expressly disapproved by the conference. And, it having been in terms provided that the article should "apply to patents in existence at the time of its being put in force," subsisting patents, including the one in suit, were freed from their previous dependency, equally with those granted afterwards; no saving distinction being made between them.

The article must also be regarded as self-executing. A contrary opinion was given by the Attorney General as to the treaty of 1883. 19 Opinions, 275. And this was followed by the Patent Office, as the correct construction, afterwards. Ex parte Zwack & Co., 76 O. G. 1855; Butterworth v. Boral, 97 O. G. 1596. It was accepted, also, by the Court of Appeals of the District of Columbia in interference proceedings, carried up from the Commissioner of Patents. Parker v. Appert, 75 O. G. 1201; Rousseau v. Brown, 104 O. G. 1120. In United Shoe Company v. Duplessis Shoe Company, 155 Fed. 842, 84 C. C. A. 76, also, it was held by the Court of Appeals of the First Circuit, that, although article 4 bis on its face was self-executing, it was controlled by implication by the passage by Congress of Act March 3, 1903, c. 1019, 32 Stat. 1225 (U. S. Comp. St. Supp. 1907, p. 1003), to give effect to it. But neither of these views in my judgment can be sustained. Having respect to their terms, it cannot be said that either the treaty of 1883 or the additional act of 1900 required legislation here to make it effective. They both undertake in the most direct and positive way to say what shall and what shall not be as to the matters with which they deal, and, being ratified in that form, nothing further, by our laws, was necessary to put them into operation. They cannot be treated as mere agreements by the high contracting parties to bring the domestic laws of each into conformity with them by subsequent action. That resulted by virtue of their own force and vigor.

A treaty is a law of the land, as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. Head Money Cases, 112 U. S. 580, 598, 5 Sup. Ct. 247, 28 L. Ed. 798. By article 2 of the treaty of 1883, the subjects or citizens of each of the contracting states shall enjoy, in all other states of the union, so far as concerns patents for inventions, etc., the advantages that the respective laws thereof then or shall afterwards accord to their own citizens or subjects, in consequence of which they shall have the same protection as the latter and the same legal recourse against all infringements of their rights, upon condition of complying with the formalities imposed upon citizens or subjects. And by article 3 subjects or citizens of states not forming

part of the union, who are domiciled or have [bona fide, according to the additional act of 1900] industrial or commercial establishments in the territory of one of the states of the union, are assimilated in this respect to actual subjects or citizens. By article 4 any one who shall have regularly deposited an application for a patent of invention, etc., in one of the contracting states shall enjoy, for the purpose of making a deposit in other states and under reserve of the rights of third parties, a right of priority during the periods thereinafter mentioned; that is to say, four months in case of designs, and six months (made twelve by article 4 of the additional act) for general inventions. By article 5 the introduction by the patentee into countries where the patent has been granted of articles manufactured in any other of the states of the union shall not entail a forfeiture; subject, however, to the obligation of the patentee to work his patent, conformably to the laws of the country. And so on, in practically every article; the same being true, also, of the different articles of the additional act, including article 4 bis, by which the independence of foreign and domestic patents is declared and made to apply to those in existence.

It is idle to suggest, in the face of these provisions and others of like character that could be quoted, that the treaty, as well as the additional act by which it was supplemented, was inoperative and lay fallow until Congress, by statute, was moved to give life to it. There is nothing to the contrary in article 17, as argued, which merely refers to the formalities required to ratify, peculiar to each country, such as a confirmation in the United States by the President and Senate. And if there was any doubt therefrom, as to the intention that it should be self-executing, it is disposed of by article 18, immediately following, where it is provided that the treaty shall go into effect within a month after the exchange of ratifications, and remain in force as to each country until a year after it shall be there denunciated. It is to be remembered, also, that the patentee here was a French subject, whose property rights were being thus protected and provided for. It is not as though he were a citizen of the United States, dependent on the domestic law, if that makes any difference. And if the contemporaneous construction given to the treaty by the executive branch of the government, following the opinion of the Attorney General, is insisted on, what is to be said of the contrary view taken by the French and the Italian governments, which is entitled to equal respect—this being a treaty?

While, then, it would be our duty, if it were possible, having regard to the terms of the treaty, to abstain from giving retroactive effect to it, there is nothing by which it can be so limited; and existing patents must therefore be held to have been unfettered, and enlarged accordingly. The authority to so extend the terms of such patents cannot well be doubted. It could have been done by special act of Congress as to any specific invention, a course that was not infrequently indulged in formerly. 22 Am. & Eng. Ency. Law (2d Ed.) 285; 30 Cyc. 918. There was also at one time a general statute by which, upon a proper showing, it could be allowed by the Commissioner. And there was nothing, therefore, to prevent it from being similarly accomplished by an enactment which should apply impartially to all in the same situa-

tion, as provided by the treaty. The construction, that the public had a right to have the monopoly brought to an end, in the case of this or any other invention, according to the terms imposed on the patent by the state of the law at the time it was granted, has nothing to stand upon. Congress has the power to revise and extend a patent, even after it has expired and the invention gone into public use. 22 Am. & Eng. Ency. Law (2d Ed.) 385. And much more is this admissible as to patents still existing. The policy of the law at present is against the extension of patents, which Act March 2, 1861, c. 88, 12 Stat. 246, expressly prohibited. But that is not controlling; the lawmaking powers having authority to change their mind upon the subject, if they see fit to do so.

It is said that, if article 4 bis is held to be retroactive and self-executing, it revives and reinstates every patent which previous to that time had expired by reason of the limitation imposed by the term of a foreign patent. But that does not necessarily follow. It was only existing patents that were affected by article 4 bis, and not those which had already terminated. Besides that, if this was the purpose, there was nothing, as we have just seen, but the wish of Congress to stand in the way of it.

It is further said, however, that Act March 3, 1903, c. 1019, 32 Stat. 1225 (U. S. Comp. St. Supp. 1907, p. 1003), having been passed for the avowed object of effectuating the provisions of the treaty, Congress, in so undertaking to act, in effect declared against the self-executing character of the treaty, and that the construction so put upon it is to be respected, if, indeed, it is not controlling. This is the view taken in United Shoe Company v. Duplessis Shoe Company, 155 Fed. 842, 84 C. C. A. 76, referred to above. But it was recognized in that case that article 4 bis, and, if so, the whole treaty, was self-executing on its face, and it is giving altogether too much force to the action of Congress to have it do away with this simply by implication. If the engagement between the high contracting parties, who entered into the treaty, was, by its terms, immediate and unqualified, which is not only demonstrated above, but is there conceded, no legislative declaration afterwards, on the part of one of them, is competent to qualify it. No doubt the treaty could be denunciated or superseded by appropriate action; but it is not to be set aside or deprived of its inherent force because of acts based upon the assumed necessity for bringing the statute law into harmony with its provisions.

But it is further said that, the act of 1903 coming after the treaty and being confined to giving effect to a part only of its provisions, Congress having deemed it advisable to go no further in that direction, the treaty is to that extent abrogated; the act as so passed being inconsistent with it. There can be no question that, as declared in the Cherokee Tobacco Case, 11 Wall. 616, 621 (20 L. Ed. 227), "a treaty may supersede a prior act of Congress, and an act of Congress may supersede a treaty." And so far as this is the necessary result of the act in the present instance, being later than the treaty, this effect must be given to it. The act of 1903, however, is somewhat peculiar. It is not confined to the purpose expressed in the title, but undertakes to amend, not only section 4887, but sections 4892, 4896, and 4902, also,

only the first of which has anything to do with the present subject. And as to section 4887 it simply re-enacts it as amended by Act March 3, 1897, c. 391, § 3, 29 Stat. 692, except that it enlarges the time after which an application for a patent filed abroad shall debar the obtaining of a patent here for the same invention from 7 months to 12 months, this period in the case of designs being fixed at 4 months; and except, also, that it provides in a new and distinct paragraph that an application filed here within the period so limited, after an application for the same invention filed abroad, shall have the same force and effect as if filed here at the time it was filed there, provided similar privileges are afforded by such foreign country to citizens of the United States by law or treaty; and provided, further, that no patent shall be granted for an invention patented or described in a printed publication in this or any foreign country more than two years before the filing in this country, or which had been in public use or on sale in this country for a like previous period.

But it is difficult to see, upon the most liberal construction, how, as so enacted, it can be given the restrictive effect that is now claimed for it. It is true that it provides for but a small part of that which is covered by the treaty, and if legislation was necessary to give effect to the treaty there would not be much left to it. But that, as we have seen, is not the case. The treaty, if uncontrolled, is self-executing. It is only as Congress in this abbreviated fashion has apparently seen fit to proceed upon a different assumption that any doubt is cast upon it. A repeal by implication is never favored, even between statute and statute; and much more is not a treaty, which has been mutually agreed to, to be overturned by a later statute, which is the individual act of one of the parties. To sustain that view in any case there must be such a clear repugnancy that treaty and statute cannot stand together, which, in the present instance, will hardly be contended for. The only inconsistency, as just stated, is that, where one deals with the subject comprehensively, the other does so restrictedly, which is not sufficient; there being nothing to convince that this was the purpose.

It is said that this is shown by the title, which commits the act to the carrying out of the treaty, which must thus be regarded as the only means appropriate for doing so. Dallemagne v. Moisan, 197 U. S. 169, 25 Sup. Ct. 422, 49 L. Ed. 709. The title of an act may no doubt be resorted to, under proper circumstances, to explain or give character to the body of it. But that it should be allowed controlling force, under the showing that is made here, is entirely unwarranted. Only about one-tenth of the act in question has anything to do with the title; the rest of it, as we have seen, being entirely unrelated, except as it deals with the general subject of patents. And with the little heed that is so paid to it in the body, it would be straining a point to accord to the title the predominant part that is now urged for it. The title being disposed of, there is nothing in the act itself to in any way disturb us. It did not undertake to undo what had been done by the treaty. At most it merely neglected to take such steps as would have brought the statute law into complete conformity with its provisions. But the treaty was not dependent upon this. It went into effect of its own force some six months before. And it is not to be set aside in any such

indirect and inconclusive manner after that. It is also further to be observed that, even if the act of 1903 is held to have superseded or abrogated the treaty, the treaty having gone into effect in this way meantime, the patent in suit and others similarly situated were thereby freed from their dependency upon corresponding foreign patents, and they could not be put back by the act into their former position, which would offend against the principle of nonretroactivity contended for, even more seriously than anything which is now complained of.

Taking treaty and acts of Congress together, therefore, the case stands this way: By section 4887, Rev. St., a domestic patent for the same invention previously patented abroad was made dependent on the term of such foreign patent, by which it was limited. The act of March 3, 1897, removed this restriction, but provided (section 8) that it should not apply to patents granted prior to January 1, 1898, nor to applications filed before that on which patents were subsequently granted. This prevented the patent in suit, for the time, from having the benefit of this legislation, having been applied for December 29, 1897, two days within the period fixed by the proviso. Then the additional act of Brussels of 1900 was ratified, by which, according to article 4 bis, there was a complete unfettering of foreign and domestic patents for the same invention; and this by express terms was made to apply to existing patents. Such was the state of the law, and such the position of the patent in suit, when the act of March 3, 1903, came into existence. As just stated, this could not undo what had already been done, nor put back the patent into its former dependent condition. Having become entitled to the full term of 17 years accorded to patents generally, it could not thereafter be again restricted. Nor did the act of 1903 indeed, undertake to do so. It simply re-enacted section 4887, as amended by the act of 1897, leaving out the limitation which time and treaty had doubly disposed of, and introducing certain provisions in conformity with the treaty. It is only by reading into this record that which is not to be found there, and has no rightful place in it—that the treaty was not retroactive, and was not self-executing, contrary to the plain effect of it—that the patent can be cut down or made dependent again upon the terms of the French patent.

For both reasons, therefore, which were discussed at the argument, the plea interposed in the court below, in my judgment, was bad, and should have been overruled; and the decree sustaining it must be reversed in consequence.