## UNITED SHOE MACHINERY CO. v. DUPLESSIS SHOE MACHINERY CO.

(Circuit Court of Appeals, First Circuit.  August 2, 1907.)

### No. 689.

1. PATENTS—TERM—EXPIRATION OF FOREIGN PATENT.

The claim that a British patent covering an invention also patented in the United States was taken out by an intermeddler, and was unauthorized, and therefore that its expiration did not affect the term of the American patent, cannot be sustained, where the American patentees authorized the taking out of a patent in England, and under the other circumstances named in the opinion, did not repudiate the one in fact obtained until after its expiration.

2. TREATIES—CONSTRUCTION AND EFFECT—RELATION TO STATUTES.

Treaties and statutes of the United States have always been practically put in the same class, so far as judicial action is concerned, to the extent that a later treaty has the same effect on a prior statute that a later statute has, and may supersede it as a later statute may supersede a prior treaty. Nor is there any practical distinction as between a statute and a treaty with regard to its becoming presently effective without awaiting further legislation which depends entirely upon its terms.

3. STATUTES—CONSTRUCTION—RESORT TO TITLE.

When a legislative act is general in its terms, the title may be resorted to for the purpose of ascertaining its proper limitations.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, § 288.]

4. PATENTS—TERM—EFFECT OF TREATY.

Article 4 bis, inserted in the international convention for the protection of industrial property of March 20, 1883, by the additional convention or act of December 14, 1900, proclaimed by the President August 25, 1902 (32 Stat. 1936, 1939), as controlled and construed by Act March 3, 1903, c. 1019, 32 Stat. 1225 [U. S. Comp. St. Supp. 1905, p. 663], "to effectuate the provisions" of such additional act of convention, did not have the effect of changing the term of an existing United States patent as fixed by statute at the time of its issuance; and such a patent granted prior to January 1, 1898, and which is limited by the provisions of Rev. St. § 4887 [U. S. Comp. St. 1901, p. 3382], to the term of a prior foreign patent, is not extended by such additional act.

5. SAME—SOLE SEWING MACHINE.

The French and Meyer patent, No. 412,704, for a sole sewing machine, expired September 17, 1902, with the expiration of the term of the prior British patent, No. 13,366, of 1888, granted to the same patentees for substantially the same invention.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 148 Fed. 31.

Elmer P. Howe and Benjamin Phillips, for appellant.

T. Hart Anderson, for appellee.

Before COLT and PUTNAM, Circuit Judges, and BROWN, District Judge.

PUTNAM, Circuit Judge.  This is a bill in equity based on an alleged infringement of letters patent No. 412,704, covering an invention for an alleged improvement in sewing machines, and issued to Zachary T. French and William C. Meyer on October 8, 1889, on an applica-

tion filed on July 30, 1888. The bill was filed on December 21, 1903, and it alleged infringements on and after October 1, 1903. The decree below was for the respondent.

The only question we need consider is whether, under section 4887 of the Revised Statutes, with its various amendments, the patent in suit was terminated on September 17, 1902, by reason of the termination of a certain British patent on that day. The legal questions involved relating to the identity of the patenting were fully discussed by us in Westinghouse Electric Co. v. Stanley Instrument Co., 138 Fed. 823, 71 C. C. A. 189, in an opinion passed down on June 14, 1905, and in Thomson-Houston Electric Co. v. McLean, in an opinion passed down on April 11, 1907, 153 Fed. 883. The learned judge of the Circuit Court correctly applied the principles stated in those opinions to the facts of this case. We have no occasion to reconsider anything said by him on that issue. This especially applies to his observation, not limited to any particular claim in either patent, but relating to the whole of each patent, to the effect as follows:

"I can find in neither patent here in question evidence of 'an essential, novel, and patentable improvement on what was claimed' in the other."

The complainant maintains that the British patent was taken out by an intermeddler. The position on this point is as follows: It is not questioned that Mr. Gregory, a patent solicitor, was authorized to represent the inventor in England, and that he sent instructions to Brooks, his correspondent there, the purpose of which was to secure simultaneous patenting. At some time, not named, a letter was discovered from one Munyon and one Goodyear to Brooks of September 14, 1888, directing Brooks to disregard Gregory's instructions, and to file the application in each country as soon as possible. There is a failure to directly prove any authority of Munyon and Goodyear to thus override Gregory. Nevertheless the Circuit Court, and we on appeal, proceeding on a bill in equity of this character as finders of the facts, have as wide a range for drawing inferences as a jury. There is no evidence that the inventor, or whoever controlled the invention, ever repudiated the British patent until after this suit was commenced, or attempted to do so. As he, whoever he was, knew that there was to be an application for a British patent, and that there was a purpose to take it out, it is beyond reasonable probability to assume that he never informed himself as to the issue of such a patent. On the other hand, the Circuit Court, and we, are entitled to assume that he obtained knowledge of what was done and acquiesced therein. Any hypothesis which would reject the conclusion of the Circuit Court in this respect, to the effect that the British patent was properly taken out, would be unreasonable.

The only other topic which we need consider is covered by the proposition of the complainant based on a series of conventions, or treaties, for the "international protection of industrial property," by which is meant especially trade-marks and patents. The first was signed at Paris on March 20, 1883, between various nations, to which ratification by the United States was completed on March 29, 1887. Articles 3, 4, and 5 of this treaty relate to patents for inventions. A subsequent

treaty, which is of no consequence in this connection, as it related only to some details, was signed at Madrid on April 15, 1891. The treaty in which we are particularly interested was signed at Brussels on December 14, 1900, and was proclaimed by the President of the United States on August 25, 1902, 32 Stat. 1936. By the agreement among the ratifying governments, this treaty which is ordinarily called "An additional act," went into effect on September 14, 1902, three days before the British patent in question here terminated. 32 Stat. 1943. Article 1, p. 1939, reads as follows:

"The International Convention of March 20, 1883, is modified as follows:

"I. Article 3 of the convention shall read as follows:

"Art. 3. Are assimilated to the subjects or citizens of the contracting states, the subjects or citizens of states not forming part of the Union, who are domiciled or have bona fide industrial or commercial establishments upon the territory of one of the states of the Union.

"II. Article 4 shall read as follows:

"Art. 4. Any one who shall have regularly deposited an application for a patent of invention, of an industrial model, or design, of a trade or commercial mark, in one of the contracting states shall enjoy for the purpose of making the deposit in the other states, and under reserve of the rights of third parties, a right of priority during the periods hereinafter mentioned.

"In consequence, the deposit subsequently made in one of the other states of the Union before the expiration of these periods cannot be invalidated by acts performed in the interval, especially by another deposit, by the publication of the invention or its working, by the sale of copies of the design or model, by the employment of the mark.

"The periods of priority above mentioned shall be twelve months for patents of invention, and four months for design or industrial models, as well as for trade or commercial marks.

"III. There is inserted in the convention an article 4 bis, as follows:

"Art. 4 bis. Patents applied for in the different contracting states by persons admitted to the benefit of the convention under the terms of articles 2 and 3 shall be independent of the patents obtained for the same invention in the other states adherents or nonadherents to the Union.

"This provision shall apply to patents existing at the time of its going into effect.

"The same rule applies, in the case of adhesion of new states, to patents already existing on both sides at the time of the adhesion."

The complainant maintains that the first paragraph of article 4 bis relates specifically to the topic we have under consideration, and that the declaration of independency is intended to prohibit any result by virtue of which a patent granted by one nation for a specified statutory term should be abbreviated as to its term by reason of the expiration of any patent granted by another nation. The paragraph relied on is obscure, because there are so many different aspects in which a patent, or anything, may be independent of or dependent on something else.

There were several international conferences between 1883 and 1900 on the topic of patents and trade-marks to which we need not refer, except the one at Brussels at which a convention was signed on December 14, 1897, never in force in the United States.

One question is the weight to be given to the article 4 bis under the Constitution of the United States. The Constitution speaks of treaties and statutes in the same breath; and they have always been practically put in the same class by the Supreme Court. More than 100 years

ago, in United States v. The Schooner Peggy, 1 Cranch, 103, 110 (2 L. Ed. 49) the court said:

"But yet where a treaty is the law of the land, and as such affects the right of parties litigating in court, that treaty as much binds those rights, and is as much to be regarded by the court as an act of Congress."

There never has been any doubt on this proposition. Consequently it was said absolutely in The Cherokee Tobacco, 11 Wall. 616, 621 (20 L. Ed. 227):

"The effect of treaties and acts of Congress, when in conflict, is not settled by the Constitution. But the question is not involved in any doubt as to its proper solution. A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty."

This has been repeated many times, the last in Hijo v. United States, 194 U. S. 315, 324, 24 Sup. Ct. 727, 48 L. Ed. 994. Consequently, so far as judicial action is concerned, a later treaty has the same effect on a prior statute as a later statute has; and, so far as the conventions pertinent here are concerned, the fact that the Constitution commits to Congress the power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries," is of no consequence, because all the powers of Congress are especially vested, either directly or indirectly, by the Constitution in similar manner; and to hold that a treaty could not abrogate a prior statute regarding patents because this particular legislative power is committed to Congress could not be permitted so long as the general rule as to statutes superseding treaties, and, vice versa, declared by the Supreme Court in the way we have pointed out exists. The rules which we have explained with reference to the relation of treaties to statutes, and as to treaties becoming immediately effective, are the necessary sequence of the decisions explained in United States v. Lee Yen Tai, 185 U. S. 213, 220, 221, 222, 22 Sup. Ct. 629, 46 L. Ed. 878.

But the respondent, now the appellee, maintains that article 4 bis of the convention of 1900 was not effectual until enacted into a statute by Congress. An examination of the decisions of the Supreme Court on this topic will show there is no practical distinction whatever as betwen a statute and a treaty with regard to its becoming presently effective, without awaiting further legislation. A statute may be so framed as to make it apparent that it does not become practically effective until something further is done, either by Congress itself or by some officer or commission intrusted with certain powers with reference thereto. The same may be said with regard to a treaty. Both statutes and treaties become presently effective when their purposes are expressed as presently effective; and, on its face, article 4 bis of the convention in question is so expressed. A striking illustration of the rule that treaties become effective in the same manner as statutes is found in United States v. The Schooner Peggy, 1 Cranch, 103, 2 L. Ed. 49, already cited. This vessel was condemned in the Circuit Court on September 23, 1800. A treaty with France became effective on September 30, 1800; and, inasmuch as the judgment of the Circuit Court

was subject to a writ of error which was sued out on October 2, 1800, the Supreme Court held that the treaty annulled the condemnation.

Nevertheless, Congress has legislated on the topic since the treaty was ratified; and, under the rule which we have stated, that subsequent legislation, so far as it expresses any Congressional purpose inconsistent with any claimed construction of article 4 bis, or inconsistent with its becoming effective of its own force, that purpose controls, and the purpose of Congress in the act to which we will refer is so marked out by implication, although not stated in express terms, that what construction should be put on article 4 bis, and what rule should be applied as to its becoming effective, have become purely academical questions so far as this appeal is concerned. The act to which we refer is that of March 3, 1903 (32 Stat. 1225, c. 1019 [U. S. Comp. St. Supp. 1905, p. 663]), which preceded in time the filing of this bill and the infringements alleged therein.

It becomes necessary in this connection to turn back to Senate Document 331, Fifty-Fifth Congress, Second Session, being a report from the Committee on Foreign Relations, with accompanying papers. This concerns the convention signed at Brussels on December 14, 1897, which we have spoken of, never accepted by the United States. We refer to the report of the United States commissioners who took part in the conference at Brussels, dated December 15, 1897. That stated as follows:

"A new article, entitled article 4 bis, provides for the mutual independence of patents applied for in the different states of the Union by persons entitled to the rights granted by the convention."

It added that the delegates from the United States supported this proposed new article under instructions; but it then proceeded as follows:

"In order to avoid any confusion in regard to the interpretation hereafter to be given to the second paragraph, which reads, 'This provision shall apply to all patents existing at the time of its entering into force,' we called attention to it in the regular meeting and found that it was the unanimous sense of the conference that the paragraph was not applicable to existing United States patents, but only to those patents whose terms might be shortened by the laws of those states of the Union in which provision is made for a shortening of the term on the lapsing of patents for the same inventions in other states.

"An existing United States patent cannot be affected by what may take place in regard to a patent for the same invention abroad. The limitation of the terms of the United States patents imposed by section 4887 was a determination at the moment of the grant of the patent of its term, and therefore the duration of the patent is unaffected by the subsequent expiration of a foreign patent for the same invention by reason of non-payment of taxes or non-working."

The article in the proposed convention to which these observations related read as follows:

"Art. 4 bis. Patents applied for in the different contracting states by persons admitted to the benefit of the convention under the terms of articles 2 and 3, shall be independent of the patents obtained for the same invention in the other states adhering or not to the Union.

"This provision shall apply to patents existing at the time of its going into effect.

"The same rule applied in the case of adhesion of new states as to patents already existing either in the Union or in the new adhering state at the time of the adhesion."

This language was literally the same as that now under discussion, found in the convention of December 14, 1900, with the following exceptions: The first sentence now closes with the words, "adherents or non-adherents to the Union," instead of the words, "adhering or not to the Union"; and also the last sentence now ends with the words, "to patents already existing on both sides at the time of the adhesion," instead of the words, "to patents already existing either in the Union or in the new adhering state at the time of the adhesion." It is not possible that these merely literal changes can in any way affect any question which we have before us. It is especially to be noted that the commissioners reported that all the commissioners present were unanimous that this proposed phraseology of the convention of 1897 would not affect the expiration of United States patents already issued. We have received, through the courtesy of the state department, a copy of the report of the commissioners who negotiated the treaty of December 14, 1900, but it makes no reference to the topic we are discussing.

Thus the convention of 1900 and the proposed convention of 1897 alike contained the provisions in reference to patents existing at the time the treaty went into effect, and relative to new adhering states, on which the complainant relies as saving its patent.

The act of 1903, to which we have referred, is entitled:

"An act to effectuate the provisions of the additional act of the international convention for the protection of industrial property."

What is there called "the additional act" is the convention of December 14, 1900. There is no express provision in the statute itself in line with the title; and it is rare that the title is effectual. We all know that Lord Coke said that it ought not be taken into consideration at all; but there are occasions when the language of an act is couched in such general terms that we must go to the title to find its limitations. The Supreme Court has reiterated Lord Coke's observation, but with the qualification which we state, to the effect that, when the mind labors to discover the design of the Legislature, it seizes everything from which aid can be derived, and then the title will have its due share of consideration. The Bark Eudora, 190 U. S. 169, 172, 173, 23 Sup. Ct. 821, 47 L. Ed. 1002. A very striking illustration of this with reference to the later statutes about aliens appears in the opinion of Judge Gray, in behalf of the Circuit Court of Appeals for the Third Circuit, in Rodgers v. United States (C. C. A.) 152 Fed. 346, 350. The statutes there in issue use the broad word aliens, and yet the title was availed of by the court to limit them to aliens who were immigrants. We cannot doubt that the act of 1903 to which we refer is to be construed as passed for the purpose named in its title; and, inasmuch as it relates to the same topics involved here as the convention of December 14, 1900, we can also have no doubt that it is to be regarded as covering the entire ground so far as it concerns us. This is the well-settled rule of construction applied under such circumstances to legis-

lation which has the form of codification. The ruling of the Supreme Court in Dallemagne v. Moisan, 197 U. S. 169, 175, 25 Sup. Ct. 422, 49 L. Ed. 709, in regard to various treaties respecting consular jurisdiction over crews of vessels of foreign nations, and referring to a statute of the United States enacted in relation thereto, observed as follows:

"This statute, having been passed by the United States for the purpose of executing the treaties it had entered into with foreign governments, must be regarded as the only means proper to be adopted for that purpose."

That observation directly applies here, and fully supports the rule of construction which we have stated with regard to legislation which has the form of codification. Fairly paraphrasing the language of the Supreme Court cited, we may say that the statute of 1903, having been passed for the purpose of executing treaties, must be regarded as expressing the only effect which Congress intended they should have to the extent of the subject-matters to which the act relates. It reenacts section 4887 in such form as Congress desired, faithfully omitting such parts of the convention of 1900 as referred to patents existing at the time it went into effect, or as referred to newly adhering states. It is to be borne in mind that treaties with foreign nations have a liberal construction, even at variance with the apparent meaning of the mere letter when interpreted according to the rules of the common law. The purpose is to work out the common intention, including that of peoples who know nothing about the common law, and who use phraseology different from that to which we are accustomed. A noticeable declaration of this fact is found in United States v. Winans, 198 U. S. 371, 380, 25 Sup. Ct. 662, 49 L. Ed. 1089, where the Supreme Court reiterated that it would sometimes go to the extent of construing a treaty with Indians as they understood it when it was made, rather than according to its letter. Certainly it would not violate any just rules, if either the executive, the judiciary, or the Congress of the United States should construe a treaty in accordance with what was clearly the common understanding of all the commissioners who negotiated it. The courts might safely do this; and, perhaps, they would be compelled to when there was a formal protocol of the proceedings of the negotiations expressing it. Under the circumstances here, Congress might well be justified in acting on the report of the commissioners who were concerned in the intended convention of 1897, to the effect that all present were of the opinion that the proposed article then under consideration could not affect existing patents in the United States, in view of the fact that the same language was carried forward into the treaty of 1900, without any contravening statement from any of the parties who negotiated it. This may well explain why it is that we find the act of 1903 in the form in which we do find it. At any rate, that act did omit the special provisions with reference to existing patents, and future. adhering states, on which the complainant relies; and, for the reasons which we have stated, we must conclude that this was purposely done.

Whatever might have been the condition with reference to a bill in equity filed before the act of 1903, covering infringement prior

thereto, we have here a statute passed before filing of the existing bill, and the infringements now alleged, which pronounces the construction we must give the convention of 1900, according to the legislative will declared since it was ratified. In any event, the courts would hesitate before giving a treaty an interpretation differing from that solemnly given it by the executive or by Congress, even if they would ever do it. According to the law as it stood when the patent in suit issued, it expired with the British patent. To enable it to run its statutory term, retroactive legislation by statute or treaty was necessary. It is not impossible that the convention of 1900 might have been regarded as retroactive and as reaching this patent; but, before any issue arose between the parties to this appeal, and therefore before any rights against the respondent could have vested in the complainant, Congress interposed and pronounced the legislative will, subsequently to the ratification of the convention, that it should not be regarded as retroactive. Consequently we find no saving clause so far as the litigation here is concerned.

In Sawyer Spindle Company v. Carpenter, 143 Fed. 976, 75 C. C. A. 162, in which we passed down an opinion on February 23, 1906, that portion of the act of 1903 which re-enacted section 4887 of the Revised Statutes [U. S. Comp. St. 1901, p. 3382] was held not to be retroactive so far as concerns patents which had then expired, and the general rule that statutes are not to be held retroactive was stated. While it is true that in Sawyer Spindle Company v. Carpenter the patentee did not rely on any international convention, and brought none to our attention, yet it is also true that the result reached in that case was in harmony with the ordinary rules of statutory construction. We are of the opinion that here the Circuit Court was correct, and that there is nothing in the treaties made by the United States, as controlled and construed by the later federal statute, which saves the complainant.

The decree of the Circuit Court is affirmed; and the appellee recovers its costs of appeal.