MALIGNANI et al. v. JASPER MARSH CONSOL. ELECTRIC LAMP CO.

(Circuit Court, D. Massachusetts. July 19, 1910.)

No. 223.

1. PATENTS (§ 132*)—TERM—EFFECT OF TREATY.
    Article 4 bis provided by the International Convention for the Protection of Industrial Property of December 14, 1900, at Brussels, ratified by the United States Senate, and proclaimed by the President to take effect September 14, 1902 (President's Proclamation Aug. 25, 1902, 32 Stat. 1940), did not repeal the limitation of a United States patent to the term of a previous foreign patent for the same invention.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 188½–191; Dec. Dig. § 132.*]

2. PATENTS (§ 99*)—VALIDITY—SUFFICIENCY OF SPECIFICATION AND CLAIMS.
    That a patent of a method for evacuating incandescent electric lamps by first introducing into a tubular elongation of the bulb suitable substances capable of being gasified by heat and combining with the gases generated by the filament when brought to incandescence to form solid or liquid precipitations, and then exhausting the bulb by means of a pump and sealing the elongation, then bringing the filament to intensive incandescence and simultaneously heating the substance in the elongation, and finally sealing off the elongation, in the specification and claim directs that, after the partial exhaustion of the bulb by the pump, the pump connection is to be sealed off, did not mention

---
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

specifically the ordinary "working" of the filament during the pump action, would not render the patent process inoperative.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 133–139; Dec. Dig. § 99.*]

**3.** PATENTS (§ 157*)—CONSTRUCTION.
When two constructions of a patent are permissible, the court will adopt that which will give to an inventor the protection to which, under the law, he is entitled.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229–232; Dec. Dig. § 157.*]

**4.** PATENTS (§ 118*)—VALIDITY—SUFFICIENCY OF DISCLOSURES.
That the claim of a patent for a method of exhausting incandescent electric lamps contains no limitation as to the extent to which the bulb must be exhausted before sealing, and the specification only states it approximately, would not render the disclosure of the patent insufficient to enable one skilled in the art to practice the process, though it might be necessary to make several tests to determine with exactness what the patentee meant by the expression "exhausted to the extent of about two millimeters of mercury."

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 118.*]

**5.** PATENTS (§ 314*)—INFRINGEMENT—ACTION—REOPENING CASE FOR ADDITIONAL PROOF.
A suit for infringement of a patent will not be reopened after final hearing to admit proof to support a defense set up by answer filed more than four years before final hearing, where the importance of the issue was as apparent at that time as later, and the matters sought to be proved were accessible during the four years.

[Ed. Note.—For other cases see Patents, Cent. Dig. §§ 550–553; Dec. Dig. § 314.*]

**6.** PATENTS (§ 328*)—VALIDITY—INFRINGEMENT.
Malignani patent, No. 537,693, for a process of evacuating incandescent lamps, held valid and infringed.

**7.** PATENTS (§ 118*)—PROCESS—SUFFICIENCY OF DESCRIPTION.
The naming of nonessential conditions by a patentee, so long as the essential conditions of a process to accomplish the desired results are set forth in the patent, is immaterial; it not appearing that the patentee describes as essential a condition which would defeat the successful performance of the process, or omits an essential condition not implied by a familiar knowledge of the art.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 118.*]

**8.** PATENTS (§ 118*)—PROCESS—DESCRIPTION.
Erroneous statements of a patentee as to the theory of his process are immaterial, so long as the patent clearly directs the reader what to do to successfully practice the process.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 118.*]

**9.** PATENTS (§ 161*)—CONSTRUCTION—SUFFICIENCY OF DESCRIPTION.
Where the language employed in a patent is indefinite or ambiguous, it should be read in the light of the reader's knowledge of the prior art.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 236½; Dec. Dig. § 161.*]

**10.** PATENTS (§ 328*)—PROCESS—DESCRIPTION.
In the practice of the process of the Malignani patent, No. 537,693, for exhausting incandescent lamps, phosphorus (though not mentioned in the patent) held to be the equivalent of arsenic, sulphur, and iodine.

**11.** PATENTS (§ 230*)—PROCESSES—SUFFICIENCY OF DESCRIPTION.
Evidence proving the operativeness, in the practice of a process, of three substances specifically named in a patent under conditions varying slightly from those indicated in the specification, but under the same conditions met with in the commercial practice of the process when another substance (not named in the patent) is employed, held sufficient to establish the equivalency of all four substances.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 230.*]

**12.** PATENTS (§ 118*)—VALIDITY—FRAUDULENT SUPPRESSION.
It is not necessarily improper for a patentee, believing himself to be the inventor of a new process, to so frame his claims and specification as to anticipate and cut off attacks in the Patent Office that may be based upon a prior art which he considers irrelevant, and for this purpose to omit mention of a

substance capable of use in the practice of his process which may have been, described in prior patents.

[Ed. Note.—For other cases, se Patents, Dec. Dig. § 118.*]

13. PATENTS (§ 123*)—VALIDITY—FRAUDULENT SUPPRESSION.
     Where a patentee, about the time of the issuance of his patent, makes public disclosures of his process which remove any doubt as to the meaning of his specification, that act is so inconsistent with an intention to reserve to himself the advantage of secrets that it negatives an attempt to deceive.

     [Ed. Note.—For other cases, see Patents, Cent. Dig. § 175; Dec. Dig. § 123.*]

14. COSTS (§ 154*)—DEPOSITIONS OF EXPERTS—IMPROPER TESTIMONY.
     Complainant held not entitled to costs for taking, transcribing, and printing the depositions of an expert, which consist of argumentative departures from the province of expert testimony and which deal in vituperative personalities.

     [Ed. Note.—For other cases, see Costs, Dec. Dig. § 154.*]

In Equity. Bill by Arturo Malignani and another against the Jasper Marsh Consolidated Electric Lamp Company. Decree for complainant.

Richard N. Dyer and John Robert Taylor, for complainants.

A. Parker-Smith, for defendant.

BROWN, District Judge. The patent to Malignani, No. 537,693, dated April 16, 1895, is for a process for evacuating incandescent lamps. The patent has been sustained by the Circuit Court for the District of New Jersey, in Malignani v. Germania Electric Lamp Co., 169 Fed. 299, and by the Circuit Court for the Southern District of New York in Malignani et al. v. Hill-Wright Electric Co., 177 Fed. 430.

In the latter opinion it was held that the Malignani patent expired March 31, 1909, by reason of the expiration on that date of the term of a prior Italian patent to Malignani.

It was contended that by "article 4 bis" provided by the International Convention for the Protection of Industrial Property of December 14, 1900, at Brussels, ratified by the United States Senate and proclaimed by the President to take effect September 14, 1902, the limitation of the United States patent by the expiration of the Italian patent was repealed. President's Proclamation, Aug. 25, 1902, 32 Stat. 1940. This contention was overruled; the court following the decision of the Circuit Court of Appeals for the First Circuit in United Shoe Co. v. Duplessis Shoe Co., 155 Fed. 842, 84 C. C. A. 76, and stating that it did not feel bound to follow the contrary conclusion as to the effect of article 4 bis expressed in the opinion of Judge Archbald in Hennebique Construction Co. v. Myers, 172 Fed. 869, 97 C. C. A. 289. See, also, Union Typewriter Co. v. L. C. Smith (C. C.) 173 Fed. 288.

The complainants have filed a special brief of 95 pages relating to the question of the limitation of the term of the patent in suit. I have carefully examined this brief, but find in it no sufficient reason to justify this court in declining to follow the decision of the Circuit Court of Appeals for this circuit.

The complainants in this brief cite the opinion of the Supreme Court in French Republic v. Saratoga Vichy Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247, as containing no intimation that the treaty was not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

self-executory. That case, however, though cited to this special point, seems on the whole against the complainants, for the court construed the special provision concerning the commercial name or trade-mark in connection with article II of the treaty (25 Stat. 1375), saying:

"That article was evidently designed merely to protect the citizens of other countries in their right to a trade-mark or commercial name, and their right to sue in the courts of this country, as if they were citizens of the United States. It could never have been intended to put them on a more favorable footing than our own citizens, or to exempt them from the ordinary defenses that might be made by the party prosecuting.

"This is made the more apparent from article II of the treaty, which reads as follows: 'The subjects or citizens of each of the contracting states shall enjoy, in all the other states of the Union, so far as concerns patents for inventions, trade or commercial marks, and the commercial name, the advantages that the respective laws thereof at present accord, or shall afterwards accord to citizens or subjects. In consequence they shall have the same protection as these latter, and the same legal recourse against all infringments of their rights, under reserve of complying with the formalities and conditions imposed upon subjects or citizens by the domestic legislation of each state.'

"If there were any doubt about the rights of the plaintiffs under the eighth article, they are completely removed by the wording of the second. The rights of the French Republic are the same, and no greater under this article than those of the United States would be."

Section 4887, Rev. St. (U. S. Comp. St. 1901, p. 3382), as it stood at the time of the grant of letters patent to Malignani, limited every United States patent to expire at the same time with a previous foreign patent for the same invention. It made no discrimination between American and foreign inventors in this respect. It applied as well to a citizen of the United States who first patented his invention in a foreign country as to a citizen of a foreign state who first patented his invention in a foreign country.

It was no part of the scheme of the treaty to enlarge the terms of United States patents granted to citizens of the United States.

To give to article 4 bis the effect of enlarging the terms of United States patents granted to citizens of foreign states, without enlarging the terms of United States patents granted to citizens of the United States, would put citizens of other countries on a more favorable footing than our own citizens. This would directly conflict with the terms of article II, and with the rule of construction applied in French Republic v. Saratoga Vichy Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247.

To avoid this inequality by holding that the treaty so changed the domestic law as to enlarge also the terms of grants of United States patents to citizens of the United States would raise a question of the constitutional power of the President and Senate, even if the power to admit citizens of foreign states to equal rights with citizens of the United States be conceded. Opinion of W. H. H. Miller, Atty. Genl., 47 O. G. 397.

Construing article 4 bis with article II, it seems to have no proper application to a statute which is a part of the domestic law concerning the terms of United States patents, affording equal legal rights to citizens of foreign countries and to citizens of the United States.

We must conclude, therefore, that the patent in suit expired on March 31, 1909. The question remaining is of the complainants' right to an accounting up to that date.

Claim 1 is in suit:

"A process for producing a vacuum in the bulbs of incandescent lamps consisting in first introducing into a tubular elongation of said bulb suitable substances capable of being gasified by heat and combining with the gases generated by the filament when brought to incandescence to form solid or liquid precipations, then exhausting the said bulb by means of a pump and sealing the said tubular elongation up, then bringing the filament to intensive incandescence and simultaneously heating the substance in the elongation aforesaid and finally sealing off the said elongation in the manner and for the purpose substantially as described."

The first defense is based upon the contention that the patent, both in the specification and claim, directs that, after the partial exhaustion of the bulb by means of a pump, the pump connection is to be sealed off before the filament is incandesced at all. This, it is said, has never been done in any lamp factory, and is impractical. In the prior art of exhaustion by a pump it was the common practice to incandesce or work the filament during the final stages of the exhaustion, in order to heat the contents of the bulb, and to generate the hydrocarbon gases contained in the filament and paste joints. The pump action was continued during the evolution of these gases, and served in removing not only the air but the gases as well.

I find nothing in the specification which negatives the use of the ordinary process for producing the partial vacuum of "about two millimeters of mercury."

The defendant contends that, as the gases from the filament are to combine with a gas introduced for the express purpose of combining with the filament gases, it was the intention of Malignani to bottle up all the gases that might be generated by the filament. This, however, is mere inference.

Another inference, equally permissible, is that he intended to avail himself of all the benefits of the usual practice during the pumping process, and that the specially introduced gas was intended to combine with such filament gases as remained after practicing the usual process of exhaustion down to about two millimeters of mercury.

That he should seek to retain that proportion of filament gases which could be pumped out with the air in the ordinary way, in order to precipitate all filament gases by his new process, would seem to be putting an unnecessary burden upon his novel step of substituting precipitation for further pumping.

The specification states that the bulb is provided with a "small glass tube, T, for the purpose of extracting the air and gases therefrom, etc." This is consistent with the view that the pumping preliminary to precipitation was to remove gases generated from the filament and from the paste as well as air.

Upon the ordinary principle of construing a patent with reference to the common knowledge of the prior art, the direction that the filament be brought to intensive incandescence after sealing is not inconsistent with incandescence or "working" during the pumping process. The claim uses the expression "then exhausting the said bulb by means of a pump and sealing the said elongation up." Does this mean according to the usual rules of construction, by means of a pump alone, or does it fairly mean by a pump used in the ordinary way with such ordinary incidents or accompaniments of pump use

as are familiar in the art? The latter interpretation is entirely permissible unless inconsistent with the specification.

The Italian patent, January 7, 1894, 3,550, gives some support to defendant's contention that Malignani intended to bottle up the filament gases, since in one mode of practicing the process the carbon filament is to be coated with a layer of powdered and readily volatile carbon. The coating of the filament with carbon powder is an indication that it was not intended that the filament gases were to be generated and pumped out before sealing.

But assuming that it was his expressed intention to utilize in the new process of precipitation, which is to occur after sealing, filament gases generated by incandescing the filament, he is at liberty before the sealing which precedes the final exhaustion of the bulb to prepare his filament for the final step of the process in any suitable way. Whether the filament is so prepared during the pumping which precedes the sealing of the bulb, or at any previous time, seems immaterial. The patented process cannot be said to be inoperative because it does not mention specifically the ordinary "working" of the filament during pump action. This is permissible to the patentee as an ordinary step accompanying the use of the pump, and is not excluded either by the terms of the specification or by its expressions concerning the theory of combination of gases after the sealing of the bulb. The working of the filament does not constitute a departure from the described process, whose novelty resides, not in the preliminary steps for securing a partial exhaustion, but in the completion of the vacuum after sealing the bulb by a gas specially introduced while the filament is highly incandescent.

The fact that in ordinary practice the filament is made incandescent during pump action and before final closing off of the pump does not constitute a substantial departure from the patented process by either the complainants or the defendant. It tends to show neither the inoperativeness of the process described in the patent nor noninfringement by the defendant.

Even if we assume in favor of the defendant the much-contested point that the filament gases remaining after the final stroke of the pump and the sealing of the bulb are negligible in quantity, and if we also assume that Malignani's theory of operation was entirely erroneous, and that the vacuum was completed merely by the presence of the specially introduced vapor and the highly incandescent filament in a sealed bulb having an attenuated atmosphere, regardless of the presence of filament gases, this, in my opinion, does not affect the result. Malignani directs the reader what to do after sealing the bulb; raise the filament to high or intensive incandescence, i. e., a higher incandescence than is used in the normal operation of the lamp. It was old to do this in working the filament before sealing the bulb, but I do not recall any instance cited from the prior art where this was done in presence of a vapor after sealing the bulb to finish the vacuum without resort to pump action.

If Malignani was mistaken in the belief that there were emanations of gas from the filament which played an essential part in securing the final result, he is yet entitled to whatever benefit results from doing what he directs shall be done.

It is true that he states that the vapor specially introduced is capable of combining with gases generated by the filament; but if there are in fact no such gases, or if they are negligible in amount, and he nevertheless accomplishes the result, it follows simply that he has named more than the essential conditions, and if he has named all the essential conditions he should not be prejudiced because of error in also naming nonessential conditions.

Having said that the doing of certain things will take out of the bulb everything that will interfere with the ordinary life of a properly evacuated lamp, it is immaterial whether or not he enumerates specifically the nature or components of the contents of the bulb after sealing.

It seems reasonable to suppose that, after partial evacuation by the old method and sealing of the bulb, its contents were the residual air and filament gases. Malignani apparently had principally in mind as the objectionable part of the contents, filament gases. Mr. Wadsworth, the defendant's expert, has principally in mind the oxygen of the residual air.

A very large part of the record is devoted to testimony concerning what in fact are the contents of the bulb immediately after sealing. But this seems immaterial, for the reason that Malignani, by saying that a final vacuum will be obtained, has said that whatever is there will disappear and the lamp will be ready for use if two things only are done after sealing; bring the filament to incandescence, and vaporize the suitable substance. Whether it is the disappearance of oxygen, or of filament gases, or of both, that completes the vacuum, is of no consequence if in fact the vacuum is completed, and if in fact no one before Malignani got this result by the same steps following the sealing of the bulb.

It is of course true that if the patentee describes as essential a condition which will defeat the successful performance of the process, or omits an essential condition not implied by familiar knowledge of the art, this should not be overlooked in determining the sufficiency of the specification and the validity of the patent. But the mere omission of the patentee to mention the working of the filament before sealing is not equivalent to an express direction that it shall not be worked. We may concede that one skilled in the art of lamp exhaustion by the old methods, upon reading the patent in suit, might infer, as defendant's counsel and expert infer, that Malignani's idea was to bottle up all his filament gases and by omitting to work the filament during pumping fail in an attempt to apply the process. We could not for this reason pronounce the patent invalid; for with ordinary intelligence his second inference would be that Malignani intended to proceed in the old way in getting his partial vacuum, and that he did not intend to introduce a novelty into this step in the process, but only in the final step.

In determining whether as a document the patent is a sufficient description, the law implies a certain degree of intelligence in the reader, and, if there is some indefiniteness or ambiguity in the language, that he should read it in the light of his knowledge of the prior art. That the reader of the Malignani patent might be required to try more than

once to get the result would not bring him within the doctrine of those cases which hold a patent insufficient where, in addition to the information contained in the patent, extensive experiments are essential to success.

The next point for the defense is based upon the fact that in practice both complainants and defendant use phosphorus, a substance not named by Malignani, to produce the vapor which is introduced for the purpose of precipitating the residual gases. The claim describes the material to be used as:

"Suitable substances capable of being gasified by heat and combining with the gases generated by the filament when brought to incandescence to form solid or liquid precipitations."

The specification enumerates "arsenic, sulphur, or iodine," and does not mention phosphorus. The defendant contends that these substances are useless; that phosphorus is the only substance that can be used with success; that Malignani knew that the best way was to use phosphorus, and avoided mentioning it in his patent. It is urged that with the substances named the process is inoperative, and that the patent is void for an insufficient specification; also, that it is void under section 4920, Rev. St. (U. S. Comp. St. 1901, p. 3394), for the reason that for the purpose of deceiving the public the description and specification were made to contain less than the whole truth relative to his invention or discovery. Mr. J. W. Howell testifies specifically to the successful exhaustion of bulbs with the substances named, and produces as exhibits bulbs that have been so exhausted. He also testifies that in the production of these exhibits he did not carry the step of mechanical exhaustion by the pump beyond that commercially used in the practice of the process with phosphorus.

This testimony seems insufficient to show that these substances can be successfully used when the pump action exhausts the bulb only to the extent of about two millimeters of mercury, as directed in the patent. There being evidence that with improved mechanical pumps it is usual in commercial practice to secure a much lower pressure than that named by Malignani, it amounts merely to saying that the same degree of preliminary exhaustion may be used with the three substances named as with phosphorus.

So far as this goes it is consistent with the complainants' contention as to the equivalency of phosphorus with the substances named, though insufficient to show the operativeness of the three substances named at a pressure such as is indicated in the patent in suit. Moreover, the character of the experiments made by the complainants' experts for the purposes of this case are not such as to show that the process is operative at the pressure named.

These experiments have been vigorously attacked by the defendant on the ground that the lamps were pumped to very low pressures before the experiments with arsenic, sulphur, and iodine were made, and that conditions were created foreign both to the Malignani described process and to commercial practice.

As the gist of the Malignani invention lies not in the production of a practical vacuum, since that was obtained by pumping alone, but

180 F.—29

in the substitution of a quick precipitation process for the slow final stages of pumping, it is quite important to know how much pumping is saved; and also it is important to know whether this pumping is saved by the adoption of an improved pump, or by a new precipitation process.

The defendant attacks the experiment with sulphur with the statement that:

"In order to prove that sulphur could produce the 'almost perfect vacuum' called for in Malignani's patent, they (the experts) pumped down to· a practically perfect vacuum before beginning, so there was nothing left for the sulphur vapor to do but condense naturally, when the torch flame was removed, and leave the vacuum where it found it."

The complainants' brief in reply, in answer to this and similar criticisms, states that these tests were never intended to exactly duplicate the commercial practice of the Malignani process either by complainants or defendant.

The complainants also say that so far as these tests are concerned the degree of initial vacuum secured is unimportant, and that the tests were designed to annihilate the theory of defendant's experts that in the use of phosphorus the vacuum was produced merely by the absorption of oxygen and not by a combination with filament gases.

Upon the whole it seems fair to say that the complainants have failed to offer proof that the substances named by Malignani are capable of completing a vacuum if the partial vacuum procured by pump action is left at two millimeters of mercury.

On the other hand, I am of the opinion that the defendant's contention that in using phosphorus the vacuum is completed by its combination with the oxygen of the air in the bulb is not proved, and I am inclined to the opinion that it is disproved. But under the practical rules, which courts are accustomed to apply, we may disregard a very large part of the controversy between the experts. It seems to be established that the Malignani patent in claim 1 in suit describes in more or less general terms a novel way of completing a vacuum and a quick substitute for prolonged pumping.

It directs that after preliminary pumping in the ordinary way the bulb be sealed and that the filament be raised by the current to a state of "intensive incandescence." Clearly this term means a condition of the filament due to a certain intensity of current. The only indication of a degree of intensity is in the specification which describes its effect, i. e., generating the gases contained in the filament.

One of the complainants' experts says:.

"This term 'intensive incandescence' made use of by Malignani is aptly descriptive of the peculiar luminous blue haze which fills the body of the lamp and surrounds the glowing filament, and which, as we now know, is a significant and characteristic physical·manifestation of the ionization of the space within the body of the lamp produced by the electric current used in overheating the filament, and constituting the critical condition disclosed by the Malignani patent for the effective vaporization of the chemical in the tubuline."

This is an entirely unjustified interpretation of the terms of the Malignani patent, and must be regarded as an attempt to read into

the Malignani patent a statement of an important condition to which Malignani makes no reference either direct or indirect.

While "intensive incandescence" in the sense attributed to it by the expert may be a novelty, though this is perhaps doubtful in view of Edison's patent 274,295, wherein he describes "a light blue halo very much spread out," yet the natural meaning of the term according to a proper construction of the Malignani patent as a document is more correctly given by the defendant's expert; and his conclusion that intensive incandescence as described in the Malignani patent was not new, but old in many patents of the prior art, is entirely justified.

In raising the filament to a high incandescence to drive out the filament gases before closing off the pump connection, both the complainants and defendant are merely following the prior art. Moreover, it was old to inject into the bulb at this stage of the process of evacuation the vapor of various substances, including phosphorus, for the purpose of assisting the action of the pump.

But the important question is not whether it was old to use intensive incandescence as an aid to pump action, or to use phosphorus as an aid to pump action; but was it old to use both together after the closing off of the pump, thereby securing a vacuum in a shorter time than by pump action aided by intensive incandescence and by the vapor of phosphorus or other substance.

In Malignani v. Hill-Wright Co. (C. C.) 177 Fed. 430, it was said:

"The essence of the process is found to exist in the intensive incandescence of the filament in the attenuated atmosphere at a time when the vapor of a suitable solid substance is present in the bulb, so that the precipitation of its gaseous contents is effected and the desired vacuum obtained."

This it may be said disregards the feature of the presence, in addition to the vapor of a suitable substance, of gases generated by the filament.

It is fair for the defendant to contend that according to the specification there should be in the bulb something to combine with the introduced vapor; but I am of the opinion that the contention of the defendant's expert and of defendant's counsel that there must be a chemical combination is not a necessary conclusion. It is a fair argument to say that one who was seeking for equivalents would naturally choose such vaporizing substances as chemical knowledge would indicate to be likely to form chemical combinations with hydrocarbons, or with such gases as would be generated from a filament. But the patentee has not limited himself to chemical combinations, and the views of defendant's expert on this point must be regarded as somewhat illiberal, though reasonable enough. Malignani has enumerated certain substances which the defendant's expert says do not combine chemically; nevertheless Malignani has stated that they do combine in a partial vacuum in the presence of a highly incandescent filament. If, under these conditions, they do combine in any way, this is within the strict terms of the patent, as well as within a reasonable view of the matter. A still more liberal view is entirely proper. The patentee says, create these conditions and a vacuum will quickly follow. If this can be done, then it seems entirely immaterial what the actual elemental action is—chemical or electrophysical. The statement that

they do combine is not a necessary part of the description of the process of getting a vacuum with these substances. It is only of consequence when we have to consider the question of the equivalency of other substances not indicated for use, and then it implies not necessarily substances that combine chemically, but substances that have properties in common with those used and that will act in substantially the same way under like conditions.

If it is true, as the defendant contends, that the substances named are such as according to ordinary chemical knowledge do not form chemical combinations with filament gases, this would indicate to one skilled in chemistry that under the special conditions named a result · followed that was not explainable upon familiar chemical principles.

Upon the proofs offered by the complainants I am of the opinion that it has been shown that in exhausting lamps a substantial amount of time is saved by using the old method of exhaustion merely to secure a partial vacuum and by completing the required vacuum by a step new in the art at the date of Malignani's application, namely, sealing the bulb, raising the filament to a high incandescence, and introducing a vapor with the result that a practically complete vacuum follows, and that this can be accomplished with substances named by Malignani to an extent that is of practical importance.

If it be true that Malignani's patent discloses means for the final exhaustion of a lamp that are new and, as Mr. Howell testifies, capable of practical application as a substitute for older methods, and if it be true that the experiments of Mr. Howell made with arsenic, sulphur, and iodine were started with the same partial vacuum ordinarily used in commercial practice with phosphorus, it seems to follow that at this pressure, whatever may be their differences in chemical character, arsenic, sulphur, iodine, and phosphorus in the presence of a highly incandescent filament, are equivalents even if they are not all equally efficient or quick in action.

If we assume, however, that in order to make a demonstration of efficiency or of equivalency it is essential to pump down below the pressure of two millimeters of mercury, can it fairly be said that this is a substantial departure from the directions of Malignani's patent? In the claim in suit there is no limitation as to the extent of exhaustion by means of a pump. Of course it is implied that the pump action is to stop something short of the prolonged pump action of the prior art, so that there is a substantial time saving or other result of value. The fact that in ordinary practice it is customary to pump down to a lower pressure than that named by Malignani, and then to use a new step intead of pump action, shows that there is practical value in the final step of the process that follows sealing of the bulb, even if that final step is unable to perfect a vacuum if started at two millimeters of pressure.

Assume for the purposes of the argument that only phosphorus is capable of perfecting the vacuum if the pressure at the end of pump action is two millimeters, yet if in practice it is found advantageous to continue the pump action to a lower pressure, and to seal the bulb at a lower pressure, then the conclusion follows that with all the improvements in pumps it has not yet been found desirable to complete the vacuum by pumping to the end. In other words, improvement in

pumps has shortened the time of producing a partial vacuum, and made it practicable in a shorter time to obtain a lower pressure by pump action alone, but has not obviated the need of supplementing pump action by a process substantially described in Malignani's patent.    The novelty and the gist of the Malignani process is in the step following the sealing of the bulb.    If, in this final step, the defendant follows Malignani, it appropriates the gist of his invention.

Were it conceded that with either of the substances named by Malignani a practical vacuum could be produced if the bulb were sealed at a pressure of two millimeters, it is obvious that the defendant could not avoid infringement by using his pump to create a pressure lower than that named by Malignani.    A mere change in the proportional parts taken by the pump and by the new step in completing the vacuum would be immaterial.    So long as the defendant continues to use this final step, it is difficult to deny that in the whole process of exhaustion it has a quantitative value, since if it had not such value the defendant would complete the exhaustion by the pump as in the prior art.    The point of consequence, therefore, is the contention that the process as described is inoperative.

Upon the testimony of Mr. Howell as to actual experiments and results I find that the process is operative with the substances named by Malignani if the pressure obtained by the pump be considerably less than that named by Malignani.    I find no direct evidence that it would be operative at the pressure named by Malignani, and the fact that the elaborate experiments of complainants' experts Messrs. Little and Thatcher were off the main lines of the case and were not directed to this important point, but to subordinate issues, such as the correctness of the respective theories advanced to explain the phenomenon, makes it necessary to base the finding that the process is operative upon the testimony of Mr. Howell and upon the fact that the defendant does not meet this positive testimony by evidence as to experiments, but places too much reliance upon the inconclusive proposition that it cannot operate upon the principle which Malignani sought to apply.

That Malignani had invented and put into practical operation a new and very important process of exhausting the bulbs of lamps is satisfactorily shown by the testimony.    I do not find in the prior art anything that anticipates the conditions created by Malignani in a sealed bulb, partially exhausted.    Intensive incandescence, phosphorous vapor, and various other vapors were used, but in connection with pump action.    I do not find sufficient evidence to show that any one before Malignani had learned that it was practical to finish the exhaustion of a globe by suspending pump action, sealing the bulb, introducing a vapor, and making the filament highly incandescent.    The case, therefore, is not based upon a paper patent granted to a mere speculator, but is a grant to the actual inventor of a practical process of great value.    We are dealing with a document granted to the person who actually advanced the art, and not with a patent that is brought forth to obstruct the advance of a practical art.    Under such circumstances the courts are disinclined to so interpret the terms of a patent as to reach a conclusion that is opposed to well-established fact, and to hold that the process described is inoperative, though the process which manifestly the inventor intended to patent is operative and valuable

in the art. When two constructions of the terms of a patent are admissible, the court will adopt that construction which will give to an inventor the protection to which, under the law, he is entitled, rather than that which defeats his right by an illiberal reading of the terms in which he has described his invention.

As the claim contains no limitation as to the extent to which the bulb must be exhausted before sealing; as the specification does not state this definitely, but only approximately; as one who failed to get a vacuum at about two millimeters would naturally use the pump to create a somewhat lower pressure and try again—I am of the opinion that the disclosures of the patent are sufficient to enable one skilled in the art to practice the process, and that the patent is not inoperative because it might be necessary to make several tests, involving more or less variation in the number of strokes of the pump, to determine with exactness what the patentee meant by the expression "exhausted to the extent of about two millimeters of mercury."

Reference to prior foreign patents named by Malignani shows that he named phosphorus and had observed the blue haze which is a guide to the operator and an indication of suitable conditions in the practice of the process. That in the United States patent he failed to mention phosphorus, the best substance for use, gives rise to a question as to his reason for doing so. It has aroused the suspicion of the defendant's counsel as to his motives, and upon his undoubted knowledge of the material phosphorus and his failure to disclose it is predicated a charge of fraudulent concealment, under section 4920. But a fraudulent motive is not a necessary inference from the omission to mention phosphorus. Assuming that the reason suggested by defendant's counsel is true, that it was omitted for the reason that phosphorus had been used in connection with old processes of procuring a vacuum, and that the desire was to preclude the defense of anticipation by former processes, it is not necessarily improper, in a patentee who believes himself the inventor of a new process, to so frame his claims and specification as to anticipate and cut off attacks that may be based upon a prior art that he considers irrelevant. If the process will work with substances named and with phosphorus also, then he is justly entitled to claim that his process does not operate upon the principle which former users of phosphorus sought to apply, but upon a different principle; and, if he omits the mention of phosphorus to avoid an entanglement in the toils of a particular branch of the prior art, it can hardly be said that this is more than a skillful and cautious patent solicitor might be justified in doing. This is quite a different thing from an attempt to obtain a patent on an old thing by mere novelty in the terms in which it is described.

It is true that the public is entitled to such full description as will enable it to practice the art at the expiration of the patent, and that the patentee is not entitled thereafter to continue his monopoly by reason of secret knowledge.

In considering whether a patentee was acting with an intention to deceive the public, by withholding information to which they are entitled, it should be remembered that patent disclosures are available for the use of the public only upon the expiration of the patent; therefore

where a patentee, about the time of the taking out of letters patent, makes such public disclosures of the actual process as to remove any doubt or uncertainty as to the meaning of his specification, this act is so inconsistent with an intention to reserve to himself the advantage of secrets that it negatives an intent to deceive, and equally so whether the disclosure precedes or shortly follows the date of the patent.   Both before and soon after the date of the Malignani patent the process, including the use of phosphorus, was fully described in scientific papers and was practiced on a large scale in various establishments under license.   The great publicity given to the process seems inconsistent with a belief that Malignani could have seriously entertained the intention to deceive the public or that his process was imperfectly described for that reason.

After final hearing the defendant moved that the taking of proofs be reopened to permit the defendant to prove that Malignani's Hungarian and Austrian patents were secret patents; that the word "phosphor" was introduced into the application for German letters patent on the requirement of the German Patent Office, and to produce other testimony bearing upon Malignani's failure to disclose phosphorus in his specification.

This defense was set up by answer filed April 2, 1906, more than four years before final hearing, and the importance of this issue was as apparent at that time as now.   The matters which defendant now seeks to prove were accessible during the four years which have elapsed, and it is now too late to reopen the case.   I am further of the opinion that the fact that certain of the patents mentioning phosphorus were secret patents would, if proved, not amount to a decisive factor in the case, and would not change the result.

I am of the opinion that the patent is valid and has been infringed by the defendant, and that the complainants are entitled to an accounting for the period prior to March 31, 1909, the date of the expiration of both the patent in suit and the prior Italian patent.

To the rebuttal deposition of one of the complainants' experts defendant's counsel made the following objection:

"Defendant's counsel also objected to the entire deposition of the witness on the ground that it is merely argumentative and vituperative of defendant's expert instead of being confined to the competent statements of such scientific facts and theories as might be known to the witness and have bearing on the elucidation of matters of the art involved in this case."

To much of this deposition in rebuttal this objection is properly taken.   Though I have not excluded the deposition, but have considered it, yet in view of the large amount of offensive and unjustifiable attacks made upon the defendant's expert, and of the great extension of the record due to "vituperative personalities" and to argumentative departures from the proper province of expert testimony, I am of the opinion that the costs to complainants should not include the expense of taking, transcribing and printing this deposition.

The defendant's motion for leave to take further proofs is denied.

The prayer for an injunction is denied.

A draft decree for the complainants may be presented accordingly.